# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN C. TATUM III and JCT CAPITAL LLC, | ) ) ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) ) ) | |
| v. | ) ) | C.A. No. 2022-0970-JTL |
| FAIRSTEAD AFFORDABLE LLC, FCM AFFORDABLE LLC, JD2 AFFORDABLE LLC, STUART FELDMAN, JEFFREY GOLDBERG, FSC EF&F LLC, FAIRSTEAD CAPITAL LLC, FAIRSTEAD CAPITAL MANAGEMENT LLC, JD2 REALTY MANAGEMENT LLC, FA DC LLC, FSC REALTY MANAGEMENT LLC, and SDF FUNDING LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) | |

## POST-TRIAL OPINION

Date Submitted: May 23, 2025
Date Decided: October 27, 2025

Thomas A. Uebler, Adam J. Waskie, Sarah P. Kaboly, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Rudolf Koch, John D. Hendershot, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Sara Shaw Tatum, Coral Gables, Florida; *Attorneys for Plaintiffs and Counterclaim Defendants.*

Ryan D. Stottmann, Thomas P. Will, Alec F. Hoeschel, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Rollo C. Baker, Jared Ruocco, Edgar Aliferov, ELSBERG BAKER & MARURI PLLC, New York, New York; Michael B. Carlinsky, Evan Forbes, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Defendants and Counterclaim Plaintiffs.*

**LASTER, V.C.**

A hedge fund manager with capital, an attorney with legal savvy, and an entrepreneur with energy and vision formed a fund complex that invested in affordable housing projects. The fund complex operated under the trade name "Fairstead."

William Blodgett was the entrepreneur. A few years later, he recruited John Tatum to join the Fairstead team. Tatum built a new segment of the business from scratch that focused on deals using low-income housing tax credits. The group formed an LLC to serve as the vehicle for pursuing the tax credit deals. The hedge fund manager and the attorney indirectly controlled the LLC. Tatum received a 5.25% interest.

With Tatum leading the charge, the tax credit business boomed. Blodgett and Tatum came to believe that they had created significant value (they had) and deserved a substantial, even controlling equity stake in the business. They spoke with the attorney, who sympathized with their position, but told them an equity restructuring would not happen until the hedge fund manager had recovered his capital. That was several years away.

Blodgett and Tatum wanted a restructuring in the near term. They also realized that if the negotiations did not pan out, they needed an alternative.

Blodgett and Tatum came up with two plans. "Plan A" contemplated restructuring the business so that they would own the bulk of the equity and have control. "Plan B" was to leave and start their own business.

Blodgett and Tatum discussed various ideas with the attorney. Eventually, Blodgett met with the hedge fund manager. He flatly rejected the restructuring concept. Tatum panicked and downloaded both personal and company files to a portable drive.

After the hard no, Tatum told the attorney that he planned to leave. He proposed that they work on a transition plan, and the attorney agreed. During the transition period, the group discussed a potential joint venture.

The attorney then saw an invoice for a "Newco Formation" that was sent to Blodgett's work address. The attorney concluded that Blodgett and Tatum did not intend to cooperate on a transition plan.

The hedge fund manager terminated Blodgett for cause. Tatum resigned without cause. Fairstead accepted his resignation and insisted that he work through his notice period. Tatum did and thought he left on good terms.

After his departure, the hedge fund manager and the attorney caused Fairstead to exercise its right to repurchase Tatum's equity interests. But instead of following the contractual valuation process, they offered him a lowball price. When Tatum rejected it, they retroactively terminated him for cause and declared that all of his equity interests were forfeited.

Meanwhile, Blodgett started his own affordable housing business. Tatum did not join him. He took a year off and then went to work in a related industry.

With the hedge fund manager and the attorney playing hardball, Tatum sued the Fairstead entities, the hedge fund manager, and the attorney. The defendants filed counterclaims.

This post-trial opinion rules in favor of the defendants on one counterclaim. They proved that Tatum breached his employment agreement by downloading and retaining company documents. As damages, they can recover the expenses they incurred investigating Tatum's breach. This post-trial opinion otherwise rules in favor of Tatum.

## I. FACTUAL BACKGROUND

The facts are drawn in part from findings made in a related arbitration between Blodgett and Fairstead (the "Blodgett Arbitration").[1] After Fairstead terminated Blodgett for cause, Blodgett filed an arbitration against Fairstead.[2] Fairstead sued here to block the arbitration, and the court directed the parties to arbitrate the claims arising under Blodgett's employment agreement.[3]

After post-trial argument in this case, the arbitrator issued an award in the Blodgett Arbitration. Whether the findings in the Blodgett Arbitration bind Tatum

---

[1] *See Blodgett v. Fairstead Cap. Mgmt. LLC, et al.*, Interim Award, No. 5425000366 (JAMS Apr. 2, 2025) (Roberts, Arb.). Citations in the form "Arb. Decision at __" refer to the arbitration decision.

[2] *See Fairstead Cap. Mgmt. LLC, et al. v. Blodgett*, C.A. No. 2022-0673-JTL (Del. Ch.).

[3] *Fairstead Cap. Mgmt. LLC, et al. v. Blodgett*, 288 A.3d 729, 761 (Del. Ch. 2023).

3

turns on the law of issue preclusion.[4] "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."[5] An arbitration operates as a prior action for purposes of issue preclusion.[6]

A judgment ordinarily does not bind a non-party,[7] but it can if a party and the non-party are in privity. That elusive term means they have a pre-existing legal relationship, outside of the prior litigation, that is sufficient to cause the adjudication to be binding.[8]

Tatum was a central figure in the Blodgett Arbitration, but not a party to it, so the arbitrator's findings only bind Tatum if he was in privity with Blodgett.

---

[4] The arbitration award titles itself as an "Interim Award," but the parties have not argued that it lacks the same force as a final award for preclusion purposes.

[5] Restatement (Second) of Judgments § 27 (A.L.I. 1982); *see Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995) ("Under the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case."). Delaware courts frequently rely on the Restatement when analyzing issue preclusion. *See In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *16 (Del. Ch. Mar. 1, 2021) (collecting authorities).

[6] *See LG Elec., Inc. v. InterDigital Commc'ns, Inc.*, 98 A.3d 135, 138–39 (Del. Ch. 2014), *aff'd*, 114 A.3d 1246 (Del. 2015) (collecting authorities).

[7] Restatement (Second) of Judgments, *supra*, § 34(3).

[8] *See In re Columbia Pipeline*, 2021 WL 772562, at *17. That is only one of the circumstances where a judgment can bind a non-party. *See id.* (identifying others); Restatement (Second) of Judgments, *supra*, § 62 cmt. a (same).

Partners in a common law partnership are in privity with respect to the subject matter of the partnership.[9] A common law partnership is simply "a joint enterprise in pursuit of profit,"[10] with a joint venture functioning as a common law partnership directed at a more specified objective.[11]

Tatum and Blodgett formed a common law partnership and operated as joint venturers for purposes of their plan to negotiate for a controlling interest in Fairstead's affordable housing business and, if Fairstead refused, leave Fairstead to start a new business.[12] The arbitrator made a similar finding, concluding that Tatum and Blodgett were joint venturers for those purposes.[13]

As a result, Tatum and Blodgett are in privity for purposes of issue preclusion for factual findings relevant to this litigation. This decision accordingly adopts the arbitrator's findings of fact to the extent they were (i) "actually litigated and

---

[9] *See Bradshaw v. Trover*, 1999 WL 463847, at *2 (Del. Ch. Apr. 30, 1999) ("As at common law, partnerships may still sue and be sued by use of the names of individual partners without naming the partnership itself.").

[10] *26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 448 (Del. Ch. 2023); *see Ramone v. Lang*, 2006 WL 905347, at *12–14 (Del. Ch. Apr. 3, 2006); *In re Est. of Fenimore*, 1999 WL 959204, at *5 (Del. Ch. Oct. 8, 1999).

[11] 48A C.J.S. Joint Ventures § 3.

[12] By June 2020, Tatum and Blodgett represented to counsel that they had agreed on terms for their "joint venture." JX 219. As joint venturers, they requested advice on negotiating for a controlling equity interest in Fairstead or pursuing their own business. JX 226.

[13] *See* Arb. Decision at 15, 18.

determined" in the Blodgett Arbitration, (ii) "essential to the judgment," and (iii) concerned the period when Blodgett and Tatum were in privity, *i.e.*, through the point when Fairstead terminated Blodgett.[14]

The facts are based on the post-trial record. Trial took place over five days. The parties submitted 2,593 exhibits, lodged twenty depositions, and reached agreement on 57 stipulations of fact. Ten witnesses testified live.[15] Each party bore the burden of proving its claims by a preponderance of the evidence.

## A.     Fairstead's Origins

Blodgett, Stuart Feldman, and Jeffrey Goldberg identified a business opportunity in the affordable housing market. Each brought something to the table. Blodgett was an entrepreneur with energy and vision. Feldman was a hedge fund manager with capital. Goldberg was an attorney with legal savvy. In 2013, they founded what eventually became Fairstead.[16]

In substance, Fairstead was a fund complex that invested in affordable housing projects. As such, it consisted of a web of affiliated entities under the common control of the fund complex's principals. In 2014, Feldman, Goldberg, and Blodgett formed

---

[14] *In re Columbia Pipeline*, 2021 WL 772562, at *16.

[15] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. Citations in the form "PTO ¶ __" refer to the parties' pretrial order.

[16] Blodgett Tr. 684. In this opinion, "Fairstead" refers to the fund complex at large.

Fairstead Capital Management LLC (the "Management Company") to serve as a general partner for a series of special purpose vehicles that would invest in affordable housing projects. The Management Company also received a carried interest in the projects.[17]

Feldman, Goldberg, and Blodgett participated in management to varying degrees. Feldman was the exclusive source of capital and ultimate decision-maker but kept a low profile and did not involve himself in day-to-day operations. He preferred to communicate through Goldberg and rely on him for information.

Goldberg served as Chief Executive Officer and was nominally in charge of day-to-day operations. But Goldberg knew little about the affordable housing business and was responsible for other aspects of Feldman's far-flung business interests. Goldberg did not attempt to learn the business until after Blodgett and Tatum made their demands for a controlling equity stake.[18]

Blodgett ran the day-to-day operations. He focused initially on acquiring market rate, rent-stabilized housing units in New York City.[19]

---

[17] *See* JX 104.

[18] Tatum Tr. 103–04, 111–12.

[19] Tatum Tr. 20–21; Goldberg Tr. 971.

**B.    Tatum Joins Fairstead.**

In early 2016, Blodgett recruited Tatum to develop a new business line focused on deals involving low-income housing tax credits (the "Tax Credit Business").[20] In April 2016, Tatum signed an employment agreement with JD2 Realty Management LLC, a Fairstead affiliate.[21]

In the Employment Agreement, Tatum agreed to devote his "best efforts and time, effort and loyalty to the business of [Fairstead]," to work for Fairstead "in good faith and to the best of [his] ability," and to "perform [his] duties in compliance with . . . [Fairstead's] written policies and procedures."[22] The Employment Agreement specified that Tatum could "not serve as a director, employee, consultant or advisor to any other person or entity," nor engage in any activity that may create "an actual, potential or apparent conflict" with Fairstead's interests.[23] Tatum further agreed that "[d]uring [his] employment, and thereafter without limitation of time," he would "not make any negative statement or otherwise take any disparaging action . . . regarding [Fairstead], or any individual employed by [Fairstead]."[24]

---

[20] Blodgett Tr. 687–88; Tatum Tr. 12–13.

[21] JX 80 (the "Employment Agreement").

[22] *Id.* § 1(H).

[23] *Id.*

[24] *Id.* § 3(B).

Tatum also agreed that "both during [his] employment and after its termination," he would "not reveal to any person or entity any of the trade secrets or proprietary or confidential information of [Fairstead]."[25] The contractually protected categories of information included

> know-how, techniques, . . . processes, strategies, . . . customer lists, customer histories, customer information, investor lists, investor histories, investor information, . . . pricing information, projects, notes, memoranda, reports, . . . budgets, plans, projections, forecasts, financial information, trading strategies, investment models or other models, . . . actual or proposed investments, assets under management, personnel, . . . forms, contracts, agreements, . . . [and] plans and proposals in whatever form.[26]

Tatum agreed to "not use or attempt to use any such information in any manner, except as may be required in the ordinary course of performing [his] duties as an employee of [Fairstead]."[27]

After Tatum came on board, Fairstead formed Fairstead Affordable LLC to serve as the vehicle for pursuing the Tax Credit Business.[28] Through his personal entity JCT Capital LLC, Tatum owned a 5.25% interest in Fairstead Affordable. The balance was owned by FCM Affordable LLC (64.75%) and JD2 Affordable LLC (30%). Feldman and Goldberg indirectly controlled Fairstead Affordable through FCM

---

[25] *Id.* § 3(A)(1).

[26] *Id.*

[27] *Id.*

[28] *See* JX 5280.

9

Affordable and JD2 Affordable. Blodgett indirectly owned a 9.71% interest through an ownership interest in FCM Affordable.

## C.    The Tax Credit Business

Before Tatum joined Fairstead, no one there "knew how to do a tax credit deal."[29] Tatum figured it out, and with him leading the charge, Fairstead "started doing tax credit deals, and the company just kept growing."[30]

Tatum focused on acquiring properties that qualified for federal low-income housing subsidies, then using tax credits and tax-exempt bonds to finance improvements.[31] The business generated multiple streams of revenue: development fees, incentive management fees, and the capital gains from an eventual sale.[32]

Compared to a traditionally financed real estate investment, a tax credit deal required considerably more work between signing and closing. It could take more than a year. During that time, the developer had to secure the tax credits and any tax abatements, potentially issue tax-exempt bonds, raise equity capital from limited partners (including negotiating with limited partners over the partnership agreement), obtain approval for construction plans, secure building permits, hire a

---

[29] Goldberg Tr. 978; *see* JX 386.

[30] Goldberg Tr. 971.

[31] Tatum Tr. 28.

[32] Tatum Tr. 29–30; Kalsi Tr. 636–39, 650–51.

general contractor to conduct renovations, and potentially restructure any contract with the Department of Housing and Urban Development ("HUD").[33]

Feldman provided the capital for the tax credit deals. That included funding all pre-development costs, such as rate locks for debt financing and the fees for architects, engineers, and other professionals. Feldman also funded hard deposits that would be forfeited if the deal failed to close regardless of the reason. A soft deposit, by contrast, is refundable if specified conditions are not met, such as a failure to secure financing or tax credits. The Fairstead team believed that offering hard deposits gave them an advantage when competing for deals.

Feldman claimed at trial that he had invested over $300 million to build the affordable housing business as a whole—not just the Tax Credit Business.[34] Much of that capital funded property acquisitions and financing for the traditional affordable housing business, with approximately $40 million supporting the platform at large.[35] Only a relatively small portion remained committed to the Tax Credit Business, because the tax credit deals involved lining up equity and debt financing at closing that enabled Feldman to recoup the bulk of his pre-development costs.[36]

---

[33] Tatum Tr. 21–22, 28–29.

[34] Feldman Tr. 1130.

[35] Goldberg Tr. 972–73.

[36] Tatum Tr. 31.

**D.     Fairstead Affordable's Growth**

When Tatum joined in 2016, Fairstead Affordable's portfolio consisted primarily of several thousand units of rent-stabilized housing in New York. During Tatum's employment, the Tax Credit Business grew. Between 2017 and 2022, Fairstead Affordable completed deals with developer fees totaling approximately $181 million.[37]

Those fees should have resulted in distributions. Under Fairstead Affordable's operating agreement (the "Operating Agreement"), the company had to make distributions "no less frequently than quarterly or within thirty (30) days following receipt of any income or proceeds of a Deal capital transaction" if its assets exceeded liabilities.[38] Yet Tatum did not receive any distributions from Fairstead Affordable.

**E.     The Other Projects**

During his time at Fairstead, Tatum worked on two projects outside of Fairstead Affordable. One was a legacy portfolio of 905 units that Feldman acquired before Tatum arrived (the "Legacy Portfolio"). The other was a portfolio of general partner interests in seventeen real estate deals (the "Hampstead Portfolio").

---

[37] *See* JX 1270 at '003 ("FA Revenue" sheet at columns C, F); JX 1168 at '002; JX 1074; JX 1158 at '002 ("FA NPV LIHTC - Detail" sheet). *See also* Tatum Tr. 37–38.

[38] JX 5280 §§ 4.1, 4.2.

### 1. The Legacy Portfolio

In 2017, the Legacy Portfolio failed inspections conducted by HUD. That adverse event jeopardized Fairstead's ability to rent the Legacy Portfolio. The resulting cash crunch threatened Fairstead's entire business.

Blodgett and Goldberg asked Tatum to work on the Legacy Portfolio. Tatum accepted reluctantly, because the project took him away from the Tax Credit Business.[39] As additional compensation, Tatum asked for a share of the promote on any sale of the Legacy Portfolio.[40] Goldberg promised Tatum that he would work with Feldman to get him an equity interest,[41] and Blodgett agreed that if necessary, he would give Tatum a portion of his own share of the promote.[42] Tatum also invested his own money in the Legacy Portfolio though an entity known as FSC EF&F LLC (the "Friends and Family Entity").

---

[39] *See* JX 109; JX 117.

[40] Tatum Tr. 54–55. In the real estate sector of the private equity industry, a "promote" is a sponsor's share in the profits of a real estate deal above a predetermined return threshold. *See* Ian Formigle, *What is a Real Estate Sponsor Promote?*, Crowd Street (2025), https://www.crowdstreet.com/resources/investment-fundamentals/what-is-a-real-estate-sponsor-promote.

[41] Tatum Tr. 89–90.

[42] Blodgett Tr. 699–700.

Tatum successfully renovated the Legacy Portfolio in record time so that it could pass the HUD inspections. Tatum also put together a refinancing that enabled Feldman to recapture all of his original equity investment.[43]

In December 2020, Feldman bought out the minority investors in the Legacy Portfolio. Tatum received $749,168 in exchange for this investment through the Friends and Family Entity.[44] Tatum never received any compensation in the form of a promote.[45]

### 2. The Hampstead Portfolio

Feldman also wanted to buy the Hampstead Portfolio. Tatum oversaw the acquisition and received a 9% share of the promote.[46] Goldberg received a 67% share of the promote, even though he never did any work on the project.[47]

In response to Blodgett and Tatum's inquiries about a restructuring, Feldman and Goldberg told Tatum that they wanted to concentrate everyone's equity ownership in one entity. To prepare for the eventual restructuring, they asked Tatum to transfer his 9% share of the Hampstead Portfolio promote to Fairstead Affordable. Tatum agreed. Tatum understood that he would receive an increased share of

---

[43] Blodgett Tr. 698; JX 1209 at '003.

[44] JX 318 at '002 ("Summary" sheet).

[45] Tatum Tr. 90.

[46] JX 174 at '002.

[47] Blodgett Tr. 706–07; JX 174 at '002.

14

Fairstead Affordable that—at a minimum—provided him with value for the 9% promote. Otherwise, he would have traded a 100% direct interest in the promote for a 5.25% interest in the promote, held indirectly through Fairstead Affordable. That would have been economically irrational, and Tatum never would have agreed to it.

Feldman and Goldberg never increased Tatum's ownership stake in Fairstead Affordable, whether as part of a restructuring or to account for his 9% interest in the Hampstead Portfolio promote. After disputes arose with Tatum, Feldman and Goldberg claimed that Tatum had forfeited his equity interest in Fairstead Affordable.[48] As a result, Tatum lost his share of the Hampstead Portfolio promote.

## F. Blodgett and Tatum Push For A Significant Equity Stake.

As time went on, Blodgett and Tatum came to believe that they had created tremendous value for Feldman and Goldberg by creating Fairstead Affordable and the Tax Credit Business (which was true). They received salaries and discretionary bonuses, but they did not have a meaningful equity stake. Blodgett and Tatum thought they deserved a significant equity stake. Blodgett and Tatum also wanted their employees to receive equity as a form of incentive-based compensation. Blodgett and Tatum wanted a restructuring that would allocate the equity in a manner they thought was fair.

Feldman was the ultimate decision-maker on any restructuring, but he liked to remain in the background. Blodgett and Tatum spoke with Goldberg about their

[48] *See* Goldberg Tr. 1096–98.

desire for a restructuring, and Goldberg encouraged them to come up with a proposal.[49] Goldberg also promised Tatum and members of his team, including William Kreinik and Tyler McIntyre, that he was working on getting them equity.[50]

Blodgett and Tatum's preferred alternative was to restructure Fairstead Affordable so that they would hold the bulk of the equity and control the business. For them, that was "Plan A." Tatum documented his ideas for a restructuring and shared them with others, including Blodgett and members of their team.[51]

When framing his proposals, Tatum envisioned a new entity— "NewCo"—that would own approximately 50% of the Fairstead Affordable business. Tatum and Blodgett would share ownership in NewCo and allocate a portion of NewCo's equity

---

[49] Tatum Tr. 61–62; Blodgett Tr. 708–11. Goldberg denies saying this, and there are no contemporaneous documents supporting Blodgett and Tatum's account. I nevertheless find their testimony credible and reject Goldberg's denial. It is logical that when Blodgett and Tatum approached Goldberg, he would have asked them for something concrete to consider. It is also logical that Goldberg would have repressed any memory of his involvement. Goldberg was always allied with Feldman. Once Blodgett and Tatum made their demands and the issue blew up, Goldberg did not want to be seen as having encouraged the demands that Feldman rejected.

[50] Kreinik Tr. 1299–301; McIntyre Dep. 24–44, 80–82; Tatum Tr. 117–18; JX 365; JX 364; JX 366; JX 391; JX 403; JX 5069. Goldberg denies this, but the employees' account is more credible. It is logical that when they asked Goldberg for equity, he would have told them that he was working on it with Blodgett and Tatum. Asking for equity was a reasonable request. The dispute was over how much.

[51] *E.g.*, JX 131; JX 132; JX 154; JX 189; JX 181; JX 226; JX 239; JX 370; JX 375; JX 379; JX 387; JX 5069; JX 437; JX 445; JX 474; JX 475; JX 476; JX 480 at '003; JX 501. *See* JX 5114; JX 5113 at '002; JX 483.

to key team members.[52] Feldman would own the other 50%.[53] Although it was not entirely clear what Goldberg would receive, Blodgett and Tatum seem to have envisioned him participating through NewCo. They did not want to get rid of Feldman and Goldberg. As Tatum wrote, Feldman and Goldberg had "earned a long term interest in our success and I want that to be clear we want them forever."[54]

Tatum shared these concepts with Goldberg, who encouraged Tatum and Blodgett to develop them. Goldberg, Tatum, and Blodgett also brainstormed other possibilities that might be part of a restructuring, including:

- creating a new real estate investment fund with outside capital;[55]

- obtaining capital from Blodgett's wealthy family;[56]

- pursuing a SPAC transaction;[57] or

- selling Fairstead Affordable to a third party.[58]

---

[52] *See, e.g.*, JX 132 at '004 (2018); JX 226 at '002 (2020); JX 480 at '003 (2021).

[53] Tatum Tr. 44, 47, 161–62.

[54] JX 226 at '003; *accord* JX 5112 at '002 ("[m]ore equitable sharing of the 50% of the economics that don't go to Stuart").

[55] Tatum Tr. 99–100; Blodgett Tr. 722, 725; Goldberg Tr. 1086; JX 337 at '003; JX 445 at '003.

[56] Tatum Tr. 99–100; Blodgett Tr. 720–21, 754–55.

[57] Goldberg Tr. 1086–87; JX 337 at '003; JX 352 at '004.

[58] Tatum Tr. 119, Blodgett Tr. 719, 722; JX 445 at '003 ("[s]uggested . . . out right sale"); JX 337 at '003 ("[a]imed at . . . exit transaction").

17

Goldberg even mused with Tatum and Blodgett about the possibility of them buying Fairstead Affordable.[59]

Goldberg did not pass any of these ideas along to Feldman.[60] At trial, Goldberg denied knowing that Tatum and Blodgett wanted substantial ownership and control, but that testimony was not credible. The contemporaneous documents show that Goldberg both knew what Blodgett and Tatum wanted *and* was trying to steer them toward possibilities that Feldman might find acceptable.[61]

During those discussions, Tatum and Blodgett argued that providing equity was necessary to secure and retain talented employees.[62] Goldberg agreed. As he acknowledged in his notes in 2019, "This is an industry where senior people want to share in promote or equity."[63] But Goldberg also told Blodgett and Tatum that an

---

[59] JX 480 at '003 ("Jeff said 'maybe better idea is for you guys to buy the whole company'"); *see* Tatum Tr. 106, 119.

[60] Feldman Tr. 1130, 1152–53.

[61] *Compare* Goldberg Tr. 1003–04, *with* JX 131 (Tatum emailing Goldberg about a profit sharing model in which "we set the developer fee ownership % in a new developer entity for all deals that close the following year"); JX 202 ("[A]ll I want is simple. Greater ownership of the business we started and continue to grow every da[y] . . . ."); JX 151 (Tatum's 2018 annual review requesting a path to own 10% of Fairstead Affordable by the next year); JX 154 (email Tatum sent Goldberg proposing to give employees equity); JX 155 (Goldberg's response to Tatum's request for more equity); JX 189 (email Tatum sent to Goldberg proposing an equity incentive plan); JX 184 (Tatum's 2019 annual review addressing his interest in an equity stake in Fairstead Affordable's projects).

[62] JX 154.

[63] JX 883.

18

equity restructuring would not happen until 2021 at the earliest, because that was when Feldman expected to have recovered all of his initial investment. Blodgett and Tatum initially accepted that timeline.[64]

## G.      Blodgett and Tatum Try To Accelerate The Timeline.

Starting around March 2020, Blodgett and Tatum sought to accelerate the point when the equity restructuring would occur. Contrary to the defendants' position, there was nothing inherently wrong with that. Blodgett and Tatum never entered into an agreement that bound them not to raise the idea of a restructuring. They could pursue an earlier restructuring and advance arguments why it was warranted. Feldman could say no. But nothing prohibited the ask. That's how the free market works.

More importantly for the events that led to this dispute, Blodgett and Tatum reached the conclusion that getting a near-term equity restructuring was an absolute requirement for them, to the point where they decided to leave Fairstead Affordable and start a competing firm if Feldman and Goldberg did not agree. In the abstract, there is nothing wrong with that either. Employees can leave and go into business for themselves. They are bound only by their fiduciary duties as employee-agents and the terms of any employment agreements they have signed, including lawful restrictive covenants. Nor is there anything wrong with employees being frank about their plans to leave and go into business for themselves if an employer does not give

---

[64] *See* JX 155; JX 156.

19

them better terms. That does not constitute an improper threat. The employer can say no. Again, that's the free market at work.

Once Blodgett and Tatum reached the conclusion that achieving a near-term equity restructuring was a necessity, they faced the prospect of hard-nosed negotiations with Feldman and Goldberg. They needed to start planning their alternative venture so that they would be ready to leave if the negotiations did not go well. Having a meaningful plan for an alternative business venture was also essential to presenting a credible bargaining position in the negotiations with Feldman and Goldberg. And again, there is nothing wrong with that. As long as employees do not use their employer's resources or breach any of their contractual obligations, they can make preparations to leave and go into business for themselves. That's capitalism.

With that in mind, Tatum and Blodgett used their personal email accounts to communicate about their plans and options.[65] While that was not problematic in itself, Blodgett began using his personal account to send confidential Fairstead Affordable information to his outside advisors so they could assist him in the negotiations and help him plan for his departure, if that proved necessary.[66] That is *not* something an employee can legitimately do. To reiterate, an employee can prepare to start a new business while still employed, but the employee cannot use the

---

[65] Arb. Decision at 16, 18; *see* Tatum Tr. 247–48.

[66] Arb. Decision at 15–19; JX 404.

20

employer's resources to do it. No one authorized Blodgett to use Fairstead Affordable information for that purpose.[67]

When preparing for their negotiation with Feldman and Goldberg, Blodgett and Tatum continued to pursue two alternatives. The first was a restructuring of Fairstead Affordable that would bring in NewCo as a new equity owner and result in Blodgett and Tatum controlling the business.[68] The other was to start their own business if Feldman and Goldberg did not agree. This decision will refer to the former as "Restructured Fairstead" and the latter as the "Separate Company."

Evidencing his understanding that he and Blodgett were going to have an open negotiation over a restructuring with Goldberg and (eventually) Feldman, Tatum sent Goldberg a model for Restructured Fairstead that envisioned Blodgett and Tatum gaining a majority of the business over time.[69] Goldberg wrote back that he did not understand what Tatum was proposing. After they discussed the idea, Goldberg reiterated that there would not be any restructuring until 2021.[70] Tatum and Blodgett regarded that timeline as unacceptable.

---

[67] *See* Arb. Decision at 26–28.

[68] JX 181.

[69] JX 189.

[70] JX 191.

On April 2, 2020, Tatum emailed Goldberg an agenda for a discussion later that day.[71] Tatum started by explaining how challenging it was to conduct employee annual reviews without being able to offer equity or set expectations about when equity might be available.[72] Tatum told Goldberg that he and the other employees were "disappoint[ed] . . . with a drawn out process like the one we are experiencing now."[73] Referring to the lack of clarity on a future equity restructuring, Tatum told Goldberg, "I will not sell a dream I know nothing about and have no control over."[74]

Meanwhile, Blodgett sought advice from Ophir Barone, the Chief Investment Officer of Caremi Partners. Blodgett's father-in-law, Donald Sussman, is a wealthy hedge fund manager, and Caremi is the entity that operates as the Sussman family office (the "Sussman Office"). Blodgett first contacted Barone in February 2020, and their discussions ramped up over the spring. They discussed how Blodgett might achieve a negotiated outcome resulting in Restructured Fairstead. They also discussed the possibility of the Separate Company. On April 1, Blodgett forwarded Barone an "FA Business Plan" that Tatum had prepared.[75] The "FA Business Plan" presented a proposal for Restructured Fairstead.

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] JX 188.

On April 20, one of Tatum's team members (Kreinik) informed Barone about a new tax credit project in Miami.[76] That was improper. The Miami project was an opportunity that belonged to Fairstead Affordable. Blodgett, Tatum, and their team could not take the project for the Separate Company without Fairstead Affordable's consent. The issue became moot because they did not interfere with Fairstead Affordable's pursuit of the project, much less secure it for themselves.

As spring turned to summer, Tatum and Blodgett retained the law firm of Rodriguez & Wright to represent them personally in the negotiations over Restructured Fairstead and advise on the Separate Company alternative.[77] Evidencing that both options were in play, Rodriguez & Wright understood that the representation might "convert into a Fairstead client matter," namely work for Restructured Fairstead.[78] Tatum and Blodgett asked Rodriguez & Wright to draft a proposal for Restructured Fairstead that they could take to Goldberg.[79] Tatum and Blodgett did not tell Goldberg that they had retained a law firm for advice.[80]

---

[76] JX 201.

[77] *See* JX 210; JX 211; JX 219.

[78] JX 5046.

[79] Tatum Tr. 74.

[80] Tatum Tr. 255; Blodgett Tr. 819.

In July 2020, Tatum began working with CEL Compensation Advisors, LLC.[81] Tatum had contacted them to provide "advisory services related to the Fairstead operating companies and investment platform."[82] Tatum's work with the compensation consultant shows that he continued to invest his time into bettering Fairstead. Eventually, Goldberg took over this project.[83]

On August 24, Tatum and Blodgett met with Barone to discuss their options.[84] They focused on the details of Restructured Fairstead. Tatum and Blodgett did not tell Goldberg about the meeting.

On September 3, Barone sent the proposal to Sussman, writing: "Obviously the ideal is that we would fund 100% of the capital but I think Will would like to allow Stuart to fund up to 50% if he so desires."[85] That was the essence of Restructured Fairstead. Blodgett and Tatum wanted to continue working with Feldman and Goldberg. The Separate Company option was the fallback alternative if Feldman refused.[86]

---

[81] JX 233.

[82] *Id.*

[83] *See* JX 838.

[84] JX 275.

[85] JX 284.

[86] Tatum Tr. 274–80.

In October 2020, Tatum and Blodgett discussed the need to "make moves ASAP."[87] Blodgett had already spoken to the Sussman Office, associated with his father-in-law. In addition, Blodgett was a member of the wealthy Tisch family, and at this point he reached out to his family office, Tisch Financial Management (the "Tisch Office"). A week later, Tatum and Blodgett met with Tisch Office executives.[88]

## H.    Tatum and Blodgett Prioritize The Separate Company Option.

In January 2021, Goldberg proposed a long-term incentive plan ("LTIP") that would provide employees with equity.[89] Goldberg's efforts showed that he understood equity compensation was needed and was trying to address the issue. For their part, Blodgett and Tatum saw Goldberg's LTIP as a signal that Restructured Fairstead was unlikely to happen, so they began focusing more on the Separate Company.

By February 2021, Blodgett felt the need to act. In his notes, he described himself as the "golden goose" who had made Fairstead "a lot of money" while receiving too little in compensation.[90] Blodgett was "[l]everaging my name, my family's name, my relationships etc." while he was "getting NOTHING in return. NOTHING."[91]

---

[87] JX 1647.

[88] *See* JX 295; JX 296; Tatum Tr. 280–81.

[89] JX 337.

[90] JX 373.

[91] *Id.*

25

Blodgett decided he needed to call the question, writing: "I'm 38 years old. The time is now."[92]

On February 25, Tatum and Blodgett sent Goldberg a proposal for Restructured Fairstead.[93] Under their proposal, Blodgett would replace Goldberg as Chief Executive Officer and Tatum would become Chief Operating Officer. Goldberg rejected the proposal out of hand. Tatum decided that they had to pursue the Separate Company option.[94] On March 1, he texted Blodgett: "Restarting is a reality. But not optimal."[95]

Blodgett still hoped to convince Feldman to back Restructured Fairstead, but he began pursuing the Separate Company option more seriously. On April 9, Blodgett sent a confidential valuation that included historic financial information and projections for Fairstead Affordable to Steve Warner and Tim Cox, two executives with the Tisch Office who were responsible for investing the family's capital.[96] Blodgett asked them to keep the information confidential.[97] He also reconnected with

---

[92] *Id.*

[93] JX 379.

[94] Tatum Dep. 139–42.

[95] JX 387. Tatum did not produce any of the texts in the record. In late 2020 or early 2021, he set his text messages to auto-delete quickly. *See* Tatum Dep. 389–91; Tatum Tr. 475. He pointed to difficulties with his spouse as the reason. Tatum Tr. 475. The defendants did not raise spoliation as an issue.

[96] JX 404; Blodgett Tr. 720.

[97] JX 404.

the Sussman Office, asking Barone whether his father-in-law would "still be there" for him.[98] Barone reassured him, and Blodgett later sent a confidential document containing financial results for all of Fairstead Affordable's investments to the Sussman Office.[99] Blodgett also forwarded information about a confidential investment opportunity to the Sussman Office and the Tisch Office.[100] Blodgett sent the materials for "educational purposes" to show his potential backers what an average team's affordable housing deal looked like with the expectation that "we would do far better."[101] He was not trying to deprive Fairstead Affordable of those opportunities.

The executives in the Sussman Office and the Tisch Office responded positively, with the chief investment officer for the Tisch Office telling Blodgett that he would "recommend [Blodgett's proposed company] as an investment for Laurie [Tisch]."[102] Blodgett downloaded other Fairstead Affordable confidential information to a folder that he labeled "Affordable Education."[103]

---

[98] JX 408.

[99] JX 416.

[100] JX 443; JX 417.

[101] JX 443; *see* Blodgett Tr. 881–82.

[102] JX 453.

[103] JX 442; JX 1358.

Tatum participated in meetings with Barone. But Tatum reasonably understood that he and Blodgett had permission to participate in these meetings. For example, Goldberg encouraged Tatum and Blodgett to meet with the Sussman Office about a Rhode Island deal to explore the possibility of outside investment.[104] Tatum also knew Blodgett was discussing the Separate Company concept with the Sussman Office and the Tisch Office.[105] But Tatum was not included on any of these emails. Tatum and Blodgett were partners in their potential venture, but the record demonstrates convincingly that Tatum did not know Blodgett was sharing confidential information and would not have supported it.

Meanwhile, Goldberg continued giving mixed signals. On May 14, Blodgett told Tatum that Goldberg had discussed potentially selling the company.[106] Tatum and Blodgett wanted to place a bid but also felt that "mentally we need to be prepared to walk."[107]

The same day, Blodgett instructed two of his team members (Kreinik and Adam Sussi) to start working secretly on plans for the Separate Company.[108] Kreinik

[104] Tatum Tr. 249–50; JX 203.

[105] *E.g.*, Tatum Tr. 330.

[106] JX 437.

[107] *Id.*

[108] Arb. Decision at 20; JX 437.

and Sussi prepared models, and Tatum helped them.[109] Kreinik and Sussi also helped develop proposals for a Restructured Fairstead.[110] The group kept their communications about the options secret, using text, personal email accounts, and personal Dropbox access.

By this point, Blodgett suspected that Feldman and Goldberg were monitoring his emails.[111] He was a bit early. The IT department began monitoring its servers for unusual downloading activity in June and started monitoring Blodgett's emails in August.

## I. Blodgett Asks Feldman To Restructure Fairstead Affordable.

On May 18, Blodgett met with Feldman to present his case for change.[112] To convince Feldman to pursue something along the lines of Restructured Fairstead, Blodgett told Feldman that the employees disliked Goldberg, that Goldberg was not running the business competently, and that employees would depart *en masse* unless Feldman made major changes.[113] Blodgett told Feldman, "Everyone is here because

---

[109] Kreinik Tr. 1350–51.

[110] Kreinik Tr. 1340–46.

[111] *See* JX 437 at '003.

[112] Blodgett Tr. 723–27.

[113] Arb. Decision at 20.

of me. But they realize that I have no power. No control."[114] He also told Feldman, "I built this. . . . Everyone says it's my company."[115]

Blodgett then told Feldman that he would leave absent a restructuring. He demanded that the restructuring make him a managing member with veto rights, 40% of the equity, and "a path to full control in 10 years."[116]

Feldman did not react favorably. He viewed Blodgett's proposal as an attempt to take over Fairstead, and he rejected it unequivocally. He also perceived Blodgett as threatening him with an employee walkout if he did not accept Blodgett's terms. But Blodgett was not making a threat, only telling Feldman what he believed was true. Blodgett also had good reason for his belief. Blodgett, Tatum, and their team had been frustrated for years over the lack of equity compensation and Goldberg's ineffective leadership. They believed they had built the business, were already managing it, and deserved to participate in the upside through a substantial equity stake.

Blodgett and Tatum texted about the meeting in real time.[117] Later, Blodgett gave Tatum a full account, including Feldman's unequivocal refusal. After hearing what happened, Tatum "panicked" and began downloading documents onto a USB

---

[114] JX 463.

[115] *Id.*

[116] *Id.*

[117] JX 466.

portable drive.[118] He copied his private folder that contained both his own personal information and Fairstead Affordable information that Goldberg had instructed Tatum to keep confidential. He also downloaded folders from the shared drive that contained Fairstead Affordable information.[119] In total, the files comprised:

- 700 personal documents, such as tax forms and family real estate documents;

- One personal valuation of his interest in Fairstead Affordable;

- 230 Fairstead Affordable documents that Tatum had been instructed to keep confidential, such as employee annual reviews, payroll records, and Feldman and Goldberg's net worth statements for tax credit applications;

- 1,450 documents from a folder called "Toolbox" that included Fairstead Affordable's organizational documents, educational materials about tax credit deals, public information about HUD programs, and employee onboarding materials;

- 50 documents from a folder called "Strategic" that included quarterly performance memoranda for Fairstead Affordable; and

- 20 documents from a folder named "Corporate" that included the Fairstead Affordable deal pipeline, investment valuations, and publicly available audits.

Tatum testified persuasively that he subjectively believed he was entitled to keep much of the information, either because it was his personal information or because he had prepared it and it represented his work product.[120] Tatum returned the USB drive without using any of the information. There is no evidence that Tatum

---

[118] Tatum Tr. 137–38.

[119] *See* Tatum Tr. 137–49; JX 5299; Crain Tr. 1370–72.

[120] Tatum Tr. 146.

transferred the information to another device.[121] Tatum made an error in judgment when downloading the information, but he later realized his mistake and did not misuse any of it.

On June 2, Blodgett met with Feldman again.[122] Blodgett pitched Restructured Fairstead under the name "Fairstead 2.0." Under this proposal, the operations of the new Fairstead venture and guarantees backing Fairstead 2.0's new investments would be financed from the cash flows from the existing Fairstead business platform.[123] Blodgett would receive 80 to 90% of Fairstead 2.0, which he would share with key employees. Feldman would be reduced from his existing majority position to 10 to 20%, which would "sunset over time." Goldberg would get nothing.[124]

That proposal was worse than what Feldman previously rejected. Not surprisingly, Feldman rejected this proposal as well. Feldman told Blodgett again that he would not give away "his company." He pointedly told Blodgett, "You're not my son."[125]

---

[121] *See* Crain Tr. 1368; Tatum Tr. 147–49; Goldberg Dep. 1048–49. Tatum deleted some of the files before returning the USB drive. Crain Tr. 1377.

[122] JX 808 at '004.

[123] Arb. Decision at 21.

[124] *Id.*; JX 808 at '004.

[125] Tatum Tr. 149, 386; *see* JX 515; Feldman Tr. 1145.

After Feldman's unequivocal refusal, Blodgett met again with Barone. Tatum, Kreinik, and Sussi came along.[126] After the meeting, Kreinik and Sussi sent their employment agreements to Barone so he could evaluate any restrictive covenants.[127] Barone later arranged for Blodgett, Tatum, Kreinik, and Sussi to meet with an employment litigator at Shearman & Sterling.[128]

On June 10, Tatum wrote an emotional email to Goldberg. He explained his plans to leave Fairstead Affordable. Tatum said that he had to leave because "so many promises have been made without resolution."[129] But Tatum did not want his departure to harm Fairstead Affordable. He promised Goldberg:

> Every organization I have been a part of was left in a better place than when I started. Fairstead will not be any different. If you take nothing else from this email, you have my word that should things end, I will help you.[130]

He proposed that they work together on a transition plan.[131] After receiving Tatum's email, Goldberg instructed the IT department to begin monitoring Fairstead's systems for any suspicious downloading activity.[132]

---

[126] Kreinik Tr. 1345; *see* JX 516; JX 523.

[127] JX 516; JX 522.

[128] JX 641.

[129] JX 545.

[130] *Id.*

[131] *Id.*; *see* Tatum Tr. 156–58.

[132] *See* JX 614.

On June 15, Tatum walked into Feldman's office and asked whether he would share control. Feldman said no. The meeting lasted only minutes.[133]

On June 16, Kreinik downloaded 2,800 files to a USB drive, including project pipeline lists and human resources information.[134] On June 23, Blodgett sent the Tisch Office a model of financial projections for a new venture. Sussi and Kreinik created the model.[135]

## J.  Blodgett Meets With Feldman A Third Time.

On June 29, Blodgett met with Feldman at his home. Blodgett told Feldman that he wanted to leave Fairstead and that he thought that Tatum, Kreinik, and Sussi were also going to leave.[136] Feldman told Blodgett, "[Y]ou can't have conversations with people in the company about leaving and starting your own company," and "you can't take any employee to work with you including [Tatum]."[137]

After the meeting, Goldberg hired Jones Day to investigate Tatum and Blodgett's conduct.[138] Goldberg still wanted a smooth transition, so he prepared a

[133] *See* Tatum Tr. 158–61; Feldman Tr. 1154–55; JX 5113 at '002; JX 571.

[134] JX 5260 at '021.

[135] JX 602; *see* Arb. Decision at 21.

[136] Blodgett Tr. 755–56; Feldman Tr. 1157–58.

[137] JX 623; Arb. Decision at 22; *see* Feldman Tr. 1157–58.

[138] Goldberg Tr. 1015–16.

transition plan for Blodgett, Tatum, Kreinik, and Sussi.[139] The plan contemplated announcing that Blodgett would leave at year-end "to pursue other opportunities . . . with Fairstead serving as investor and operational partner in the new to-be-announced venture."[140] Goldberg also worked on what Fairstead's participation in the new venture might entail.

At the end of July, Blodgett, Tatum, Kreinik, and Sussi prepared their resignation letters.[141] They did not send them because Goldberg was attempting to broker a smooth departure.

## K.      Blodgett Meets With Feldman A Fourth Time.

On August 4, Blodgett and Feldman met for a fourth time. During the meeting, they discussed Fairstead participating in a joint venture with Blodgett's new firm.[142] After the meeting, Blodgett, Tatum, Kreinik, and Sussi began following the transition plan that Goldberg prepared.[143] Blodgett was optimistic about a negotiated solution.

---

[139] JX 647.

[140] JX 647 at '005; *see* JX 648.

[141] JX 675; JX 689; JX 2112; JX 2113.

[142] Feldman denied any discussion of a joint venture, but his testimony was not credible. Feldman Tr. 1167, 1222–27.

[143] *See* JX 750; JX 5308; JX 5309; JX 722; JX 738; JX 739; JX 760. *See also* Blodgett Tr. 768–69; Tatum Tr. 172–75.

He told one of his mentors, "I could be wrong but I think I am on the right path to getting a transition agreement and releases done."[144]

As the summer progressed, that optimism faded. Feldman and Goldberg never clearly framed the terms on which they would allow Blodgett and his team to leave. Feldman and Goldberg also sent mixed messages. Feldman styles himself as a tough negotiator and did not want to make any concessions. Goldberg was more pragmatic and wanted to get a deal done.

On September 5, Kreinik told Goldberg that he was resigning and understood he would be released from his restrictive covenants as part of the transition plan.[145] Goldberg told him there was no agreement on that point.[146]

On September 12, Rodriguez & Wright sent an invoice for "Newco Formation" to Blodgett's work email.[147] Blodgett correctly suspected that Feldman and Goldberg were monitoring his work emails. He contacted Tatum, who asked Rodriguez & Wright to recall the email.[148] But the recall had no effect on the already-delivered electronic record, and Goldberg promptly learned about the invoice.[149] Goldberg

---

[144] JX 729.

[145] JX 755.

[146] *See* JX 1255.

[147] JX 1692.

[148] JX 1693.

[149] Seth Hoffman, Fairstead's General Counsel, encouraged Feldman and Goldberg to disclose the investigation to Tatum and inform Tatum that there was no

concluded that Blodgett and his team did not intend to cooperate on a transition plan and were instead going to start a new company imminently.

## L.    Feldman Tries To Squeeze Blodgett.

On September 14, Feldman met with Blodgett and handed him a termination notice.[150] The notice advised Blodgett that he had breached his employment agreement and was therefore terminated "for reason."[151] The termination notice purported to cancel Blodgett's interests in various employment-related equity interests that he owned.

At the same time, Feldman handed Blodgett a term sheet for a joint venture that was highly favorable to Feldman.[152] It was an obvious pressure tactic: Feldman was using the threat of a for-cause termination and the loss of his equity to get Blodgett to accept one-sided terms for the joint venture.[153]

Fairstead's outside counsel had prepared for-cause termination letters for Tatum, Kreinik, and Sussi. The lawyers recommended that Feldman and Golberg (i)

---

planned transition. JX 5106 at '002. Feldman and Goldberg decided to keep the investigation secret and did not ask Tatum to return the documents they knew he downloaded. They saw value in holding that card to play later.

[150] JX 783; Feldman Tr. 1174.

[151] JX 783.

[152] JX 784.

[153] Blodgett Tr. 770–71. Feldman contends the term sheet was a settlement proposal to avoid litigation.  Feldman Tr. 1174–76. If so, it was a settlement proposal offered as a slightly better option relative to a for-cause termination and the loss of equity.

confront them about their downloading activity and (ii) make clear that there would not be any transition involving releases from their restrictive covenants.[154] But Feldman and Goldberg did not want to take a hard line with Tatum. Recognizing that Blodgett was leaving, they wanted Tatum to stabilize Fairstead Affordable and the Tax Credit Business.[155]

Because Blodgett did not immediately accept the joint venture proposal, he viewed himself as terminated. He and Feldman would spend months attempting to negotiate a resolution, including through formal mediation. They never reached agreement.[156]

## M. Tatum Resigns.

On October 15, Tatum emailed Goldberg to confirm he was resigning.[157] Tatum acknowledged that he was resigning without "Good Reason."[158] Fairstead accepted Tatum's resignation.[159] Tatum understood that Fairstead would not require 120-day

---

[154] *See* JX 5106; JX 5104.

[155] JX 5106 at '002; Goldberg Tr. 1065–70; *see* Tatum Tr. 171–84.

[156] Blodgett Tr. 773–75; JX 789; JX 794; JX 796; JX 800; JX 808; JX 5310; JX 802; JX 798; JX 818; JX 827; JX 828; JX 863; JX 873; JX 5311 (summary of mediation); JX 942; JX 943 (Blodgett's counsel's post-mediation strategy); JX 948 (same); JX 991; JX 992; JX 999; JX 5312 (January 15, 2022, Blodgett notes).

[157] JX 860.

[158] Tatum Tr. 185–87; JX 851.

[159] JX 851 ("As you are resigning without Good Reason . . .").

prior notice under the Fairstead Affordable Operating Agreement, but Fairstead enforced that requirement. Days later, Sussi and Kreinik resigned.[160]

On November 3, Blodgett formed Tredway, a new affordable housing company. On November 5, Blodgett informed Fairstead that he was starting a competing venture. Early drafts of the Tredway documents identified Tatum, Kreinik, and Sussi as "founding partners."[161] Sussi and Kreinik joined Tredway. Tatum did not.[162]

On December 23, after Fairstead's mediation with Blodgett failed, Fairstead sent a letter accusing Tatum of improperly retaining Fairstead documents based on a forensic examination.[163] On the same day, Fairstead accused Kreinik of stealing documents.[164]

Tatum continued working at Fairstead Affordable through his notice period. On January 18, 2022, he turned in all of his electronic devices plus a thumb drive. He represented that he was not keeping "any confidential or Proprietary Information as defined in Section 3 of [my] Employment Agreement."[165] He only kept two categories of documents. The first consisted of valuations of units in Fairstead Affordable and

---

[160] JX 850; JX 862.

[161] JX 1120 at '002.

[162] Tatum Tr. 205–09; Blodgett Tr. 775–76.

[163] JX 978.

[164] JX 974.

[165] PTO ¶ 40; JX 1016.

the employee co-investment vehicle. The second consisted of his annual reviews, documents relating to Goldberg's promised restructuring, and his transition efforts, which he thought he might need if litigation ensued.[166] The defendants failed to prove that any of the documents were competitively sensitive or that Tatum acted improperly by keeping them.[167]

Tatum's last day at Fairstead Affordable was February 10, 2022. When he left, Tatum planned to wait out his non-compete period. He thought he might work with Blodgett after it ran, but he also intended to explore other options.[168] He ended up deciding not to work with Blodgett.

---

[166] Tatum Tr. 148, 184–89.

[167] Tatum Tr. 189. Through their cross examination, the defendants implied that Tatum took a sensitive deal pipeline. *See* Tatum Tr. 446–48 (citing JX 1066). Tatum in fact photographed a pipeline from 2016 to show there were no deals before he arrived. The defendants also implied that Tatum misappropriated sensitive employee information. *See* Tatum Tr. 448–49 (citing JX 1575). The photo showed one of Goldberg's proposals for an equity distribution, and Tatum took it so he could show that Goldberg made promises about equity (which Goldberg denied making during this litigation) and that those promises went unfulfilled. The defendants also implied that Tatum appropriated sensitive "process information." *See* Tatum Tr. 445–46 (citing JX 1000). The document reflected high-level know-how that Tatum himself developed. Last, the defendants implied that Tatum misappropriated and misused valuation materials. *See* Tatum Tr. 449–50 (citing JX 1183). As an owner of Fairstead Affordable equity, Tatum properly kept it. Confirming that fact, the Fairstead Affordable valuations were openly shared with other holders of its equity. JX 1168. The aspersions-by-cross-examination did more to undercut the defendants' credibility than to impeach Tatum's or suggest wrongdoing on his part.

[168] JX 5314; JX 5315; JX 5316.

### N.     Fairstead Takes Tatum's Equity.

After Tatum's departure, Fairstead exercised its right to repurchase his equity. The operative agreement called for a valuation process to determine a buyout price.

The first step in that process was for Tatum to identify the list of stabilized deals in which he held equity interests (the "Stabilized Deals"). Tatum provided his list, expecting Fairstead to follow the valuation process. Rather than doing so, Fairstead offered Tatum $1.3 million, a figure materially below his contributed capital and far less than the value of his equity as a whole. Tatum rejected the offer and asked Fairstead to comply with the valuation mechanism.

Rather than comply, Fairstead sent Tatum a letter claiming that he had been terminated for cause and declaring that all of his equity interests were forfeited.[169] The letter retroactively set a termination date of May 6, 2021. Goldberg admitted at trial that Fairstead only decided to take this hardline position after Tatum rejected the lowball buyout offer.[170] Internally, Goldberg told employees that the dispute with Tatum was over valuation, not a for-cause termination.[171]

### O.     This Litigation

On October 26, 2022, Tatum filed this lawsuit against Fairstead Affordable LLC, FCM Affordable LLC, JD2 Affordable LLC, FSC EF&F LLC, Fairstead Capital

---

[169] *See* JX 1140.

[170] Goldberg Tr. 1029–32.

[171] Byrd Dep. 175–76.

LLC, Feldman, and Goldberg. Tatum asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, and quantum meruit. He also sought declaratory judgment confirming his continuing equity ownership, an accounting, and a constructive trust on any profits the defendants derived to which he was entitled.[172]

Fairstead filed counterclaims against Tatum for breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference with contractual relations. It also sought a declaratory judgment that Tatum was fired for cause and a permanent injunction to prevent Tatum from using or disseminating confidential information.

Each side moved to dismiss the other side's claims, at least in part. The court issued a series of orders addressing the motions. The claims generally survived, except that the court dismissed Fairstead's counterclaims under the faithless servant doctrine, for breach of the implied covenant of good faith and fair dealing, for breach of contract based on Tatum allegedly working for a competitor, and for violation of his non-solicitation provision. The court also dismissed Fairstead's claim for a declaratory judgment determining that Fairstead fired Tatum for cause. The case proceeded through trial.

---

[172] For simplicity, this decision generally refers to the defendants collectively as Fairstead.

## II.    LEGAL ANALYSIS

Tatum sought to prove at trial that Fairstead breached the Operating Agreement by declaring forfeit all of Tatum's equity interests, abandoning the appraisal process, making his departure as lengthy, painful, and costly as possible, and making false promises about an equity restructuring that induced him to stay at the entity. Tatum proved by a preponderance of the evidence that Fairstead breached the Operating Agreement in all these ways except the last. Tatum is entitled to damages for his successful claims.

Tatum also sought to prove at trial that Fairstead is liable for the value of his share of the Hampstead Portfolio promote under a theory of promissory estoppel and for the value of his share of the Legacy Portfolio promote under a theory of unjust enrichment. He proved both claims and is entitled to damages.

Fairstead sought to prove that Tatum breached his contractual obligations, breached his fiduciary duties, aided and abetted breaches of others' fiduciary duties, and tortiously interfered with contractual relations. Fairstead largely failed to prove its counterclaims. Fairstead proved by a preponderance of the evidence that Tatum improperly downloaded and retained Fairstead Affordable documents in breach of his employment agreement. As damages, Fairstead can recover the expenses incurred investigating Tatum's breach. Judgment will be entered in favor of Fairstead on this counterclaim and in favor of Tatum on the rest.

## A. Tatum's Claims For Breach Of The Operating Agreement

Tatum contends that Fairstead breached three provisions of the Operating Agreement. To prevail on a breach of contract claim, the claimant must prove "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages."[173] When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent."[174] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[175] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[176]

### 1. Tatum's Claim For Breach Of The Vested Interest Provision

Tatum contends that Feldman and Goldberg caused Fairstead Affordable, FCM Affordable, and JD2 Affordable to declare forfeit all of Tatum's equity interests, thereby breaching language in the Operating Agreement providing that the equity

---

[173] *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[174] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[175] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[176] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

interests had vested (the "Vested Interest Provision"). Tatum proved that claim and is entitled to damages.

### a. Breach Of The Vested Interest Provision

The Vested Interest Provision states:

> The Membership Interest held by [Tatum] as of the date hereof shall be treated as a "promote" or "carried interest" in exchange for Tatum's services as an employee ("Employment") to one or more Affiliates of the Company (including Employer), and shall vest (or, as the case may be, shall be forfeited) to the extent provided in, and subject to, the following terms.[177]

Other language in the Vested Interest Provision contemplates five ways Tatum could leave Fairstead Affordable, each with different implications: (i) resignation for good reason, (ii) resignation after a change in control, (iii) resignation without good reason, (iv) termination without cause, and (v) termination for cause. None authorizes Fairstead to declare Tatum's equity forfeit.

Tatum resigned without good reason, and Fairstead accepted his resignation. On June 10, 2021, he told Goldberg that he would resign if conditions did not change.[178] Nothing changed, and Goldberg proceeded as if Tatum had resigned. Goldberg worked with Tatum on a transition plan and asked him not to tell any third parties that he was leaving until Fairstead had a communication plan in place.[179] On October 21, Tatum received notice that his resignation had been accepted and

---

[177] JX 5280 § 8.8(a).

[178] *See* JX 545.

[179] JX 860.

Fairstead was enforcing the 120-day notice period in the Operating Agreement.[180] Fairstead also "reserve[d] any and all rights, claims and recourse [it] might have against you, whether arising by or in contract, law, equity or otherwise."[181] Tatum agreed not to contest Fairstead's characterization of his termination and thought he left on good terms.[182] It was not until June 2022, after Tatum rejected Fairstead's lowball buyout offer, that Fairstead purported to convert Tatum's departure retroactively into a termination for cause and to declare his equity interests "forfeited and canceled."[183]

Fairstead claims it properly forfeited Tatum's interests based on a retroactive termination for cause, citing *Metro Storage*.[184] There, the court held that the employer "had grounds to terminate [an employee] for cause and that they would have done so if they had known about his secret consulting work."[185] In other words, the employer found out after the fact about grounds for a for-cause termination that the employee had concealed. Here, Fairstead grounded the retroactive for-cause termination on Tatum and Blodgett's plan to leave Fairstead and start a new company, but they

[180] JX 847.

[181] *Id.*

[182] *See* JX 916; JX 1016 at '002; Tatum Tr. 171–84.

[183] JX 1140.

[184] *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022).

[185] *Id.* at 881.

knew the relevant details before accepting Tatum's resignation. Under those circumstances, Fairstead cannot retroactively recharacterize Tatum's departure as a termination for cause.

Fairstead breached the Vested Interest Provision by purporting to forfeit his interests based on a retroactive termination for cause. Tatum is entitled to damages for that breach.

### b. The Remedy For Breach Of The Vested Interest Provision

Tatum proved that Fairstead had no basis to forfeit his equity. Under the Operating Agreement, Tatum was entitled to the value of the Stabilized Deals. As damages, Tatum is entitled to that amount.

### i. Which Deals Were Stabilized

Tatum and Fairstead disagree about the Stabilized Deals. A deal is stabilized if (1) "substantial completion of any construction has been achieved," (2) "the Deal is eligible for permanent financing," and (3) "any construction or stabilization guarantees provided by any Member of the Company have been released or the conditions for release of the same have been satisfied" (the "Stabilization Test").[186]

---

[186] JX 5280 at 7.

47

Tatum contends that twenty-three deals met the Stabilization Test as of February 10, 2022 (his last day).[187] Fairstead acknowledges only five.[188] The contemporaneous evidence undercuts their lowball count. By November 2021, Fairstead's Chief Financial Officer concluded that six deals were Stabilized and that three deals were "close."[189] Tatum proved that his twenty-three deals met the Stabilization Test. Fairstead's challenges to eighteen of those deals fall short.

### (i) Substantial Completion of Construction

Fairstead argues that two deals failed the construction prong of the Stabilization Test. The issuance of a Certificate of Substantial Completion of Construction indicates when construction is substantially complete.[190]

Fairstead claims the Clifton deal did not achieve substantial completion, even though its Certificate issued on December 31, 2021.[191] They observe that the Certificate identified outstanding work obligations to be completed within a specified

---

[187] In addition to the five deals Fairstead identified, Tatum believes the following eighteen deals are Stabilized: Clifton, Colony, Euclid Hill, Federation Davie, Federation Gardens, Federation Gould, Federation Sunrise, Federation Towers, Federation Towers Land, Federation Weinberg, Festival Field, Findlay, Forest & Village, Foresthill, Franklin Square, Owls Nest, St. Martins, and Woodland.

[188] Fairstead believes the following deals are Stabilized: Berkley, Echo Valley, Heritage Acres, Hope Village, and St. Marks.

[189] JX 909 (at Column D).

[190] Hale Dep. 228–29.

[191] JX 5211.

period of time.[192] After that work was done, the lender on the deal asked that the Certificate be reissued.[193] According to Fairstead, that means construction on the Clifton deal was not substantially complete despite the issuance of the Certificate.

Fairstead's position is unpersuasive. Construction must be *substantially* complete, not *entirely* complete. Having some additional work to do comports with the definition. The lender asked for an updated certificate to confirm that the additional work was completed, not because the original certificate was issued incorrectly.[194] Fairstead booked the developer fee-revenue consistent with a December 31, 2021 substantial completion date. The Clifton deal met the substantial completion test.

Fairstead also claims that the Federation Weinberg deal did not satisfy the substantial completion prong. Fairstead closed on the property in 2021, and the remaining work consisted of six limited repairs—such as replacing bathroom sinks and resurfacing countertops—scheduled to take approximately four weeks.[195] Fairstead represented to HUD that this work did not constitute construction but rather fell under "capital repairs."[196] Both Tatum and Kreinik testified consistently

---

[192] *Id.*

[193] JX 5213.

[194] *Id.*

[195] *See* JX 1780; JX 1684 at '013.

[196] *See* JX 5217 at '001.

that the scope of remaining work was modest and in line with routine post-acquisition obligations.[197] The Federation Weinberg deal met the substantial completion test.

### (ii)    Eligibility For Permanent Financing

Fairstead argues that seven deals failed the permanent financing prong of the Stabilization Test.[198] Tatum proved that each satisfied that element at the tax-credit closing. At that point, the loans on each project were long-term, fixed-rate, amortizing obligations consistent with the industry-standard definition of permanent financing. Fairstead's own closing summaries referred to the loans as "permanent."[199] Fairstead's internal trackers reported that there was "no construction loan" on those deals.[200] Fairstead's models labeled the debt as "Permanent Financing," and third-party underwriters, lenders, and limited partners all described the loans using the same term.[201] Kreinik and Tatum testified persuasively that the debt was permanent financing.[202]

---

[197] *See* Tatum Tr. 217–18; Kreinik Tr. 1327–30.

[198] The seven deals are Federation Davie, Federation Gardens, Federation Gould, Federation Towers and Land, Federation Weinberg, Foresthill, and Clifton.

[199] *See, e.g.*, JX 5019 at '004; JX 5020 at '004; JX 5047 at '004.

[200] *See* JX 589 at '003.

[201] *See, e.g.*, JX 5325 at H153; JX 5057 at '012–019; JX 5015 at '006–022; JX 5045 at '006–016; JX 5050 at '017–027.

[202] *See* Kreinik Tr. 1307–25; Tatum Tr. 221–24.

Fairstead argues that the parties intended to adopt a bespoke definition of "permanent financing" that required not only a permanent loan in place, but also the elimination of all construction and stabilization obligations. That interpretation appears nowhere in the agreement, and Fairstead's own internal documents contradict it. Fairstead's primary witness on that point conceded at trial that he crafted the definition for litigation.[203]

### (iii) Release of Guarantees

Fairstead argues that fourteen deals failed the guarantee prong of the Stabilization Test.[204] They argue that Feldman and Goldberg had given personal guarantees that remained in place. The Operating Agreement, however, only considers guarantees from a "Member" of Fairstead Affordable—defined as JD2 Affordable, JCT Capital, or FCM Affordable. Tatum proved that there were no member guarantees on any of the properties.

Fairstead argues that the guarantee prong must extend beyond Members to affiliates of Members, thereby encompassing Feldman and Goldberg. That could make sense as a business matter, but it finds no support in the contractual text. The term "Member of the Company" excludes Feldman and Goldberg in their individual capacities. Fairstead does not argue the text is ambiguous, and it offers no alternative

---

[203] *See* Hale Tr. 1286–87.

[204] The fourteen deals are Franklin Square, Findlay, Colony, Festival Field, Owls Nest, Euclid Hill, Federation Towers and Land, Clifton, Federation Gardens, Federation Sunrise, Forest Village, Forest Hill, St. Martins, and Woodland.

51

reading. In another section of the Operating Agreement, the parties referred expressly to "Members or related persons," confirming that they knew how to include affiliates when they intended to. They chose not to do so in the Stabilized definition.

Fairstead attempts to work around the plain language by pointing to Section 3.2(b), which contemplates that JD2 Affordable would ensure that "its direct or indirect principals" would provide guarantees if necessary. The Stabilization Test, however, does not pick up that provision. Feldman and Goldberg—the indirect principals—retained full control over how any guarantees would be issued. They could have given personal guarantees and had JD2 Affordable issue a guarantee in addition to theirs, or they could have guaranteed the guarantee from JD2 Affordable. They chose not to structure their affairs in a way that would prevent the Stabilization Test from being met.

This case presents the same type of interpretive issue as the *Aearo Technologies* case.[205] There, a wholly owned subsidiary secured insurance that required the "Named Insured" to satisfy a retention before the insurer would provide coverage. The parent paid the retention, rather than the subsidiary paying it. The insurer denied coverage, contending that the policy defined the Named Insured as the subsidiary, not the parent.[206] The Delaware Supreme Court agreed with the insurer, rejecting the argument that as a matter of economic substance, the economic

---

[205] *See In re Aearo Techs. LLC*, 2025 WL 2312921 (Del. Aug. 12, 2025).

[206] *Id.* at *1.

enterprise that obtained the insurance incurred the retention before seeking coverage. The justices explained that "[t]he policies unambiguously required certain Aearo entities to satisfy each [retention and] specifically identified which entities in the corporate hierarchy could satisfy the [retention]."[207]

So too here. As in *Aearo Technologies*, the Operating Agreement unambiguously specified which guarantees mattered for the Stabilization Test, namely only those from a "Member of the Company."

Fairstead points to extrinsic evidence to support its argument that guarantees from Feldman and Goldberg should count, but the contract is clear. The parties could have structured their affairs differently but chose not to.[208] That was a business decision, not a basis to rewrite the agreement's definition of "guarantee."

Finally, Fairstead cites Tatum's original complaint, which framed the concept of "Member Guarantees" more broadly. Tatum credibly explained that he misunderstood the legal standard before obtaining discovery in this case. Once he reviewed the actual agreements, it was clear that none of the Members remained obligated on the disputed deals.[209] An early characterization, corrected during litigation, cannot override the plain meaning of the contract. Tatum proved that the fourteen deals met the guarantee prong.

---

[207] *Id.* at *15.

[208] *See* Tatum Tr. 465–66; JX 337 at '002; Hale Tr. 1288.

[209] *See* Tatum Tr. 455–57, 462–63.

53

## ii. The Value Of The Stabilized Deals

The next question is the value of Tatum's 5.25% interest in the Stabilized Deals. Tatum proved that he is entitled to $7,864,949.[210]

Tatum relied on Andrew Lines and Dharminder Kalsi of CohnReznick. Lines is an experienced real estate appraiser specializing in Low-Income Housing Tax Credit ("LIHTC") properties, and he appraised the value of each project.[211] Kalsi is an expert in valuing interests in tax-credit partnerships, and he used Lines's project-level cash flow forecasts and the waterfall provisions in the operating agreements to determine the present value of Fairstead's interest in each deal. He then multiplied that result by 5.25% to calculate the value of Tatum's interest.[212]

Fairstead's internal documents corroborate CohnReznick's work. In March 2022, Fairstead's Chief Financial Officer submitted a schedule to Signature Bank showing estimated fair market values for the same properties that were, on average, 12% higher than CohnReznick's valuations.[213] Fairstead's LTIP Model, which Goldberg used for compensation decisions, used methodologies and generated outcomes that were materially consistent with CohnReznick's valuations.[214]

---

[210] JX 5261 at '043.

[211] Lines Tr. 504–07, 510; JX 5261 at '294–825; JX 5261 at '300.

[212] Kalsi Tr. 600–01, 611–12; JX 5261 at '047–293.

[213] *See* JX 1074 at '006; *compare* JX 5261 at '300.

[214] JX 1158; JX 5261 at '040.

Fairstead's rebuttal expert, Mark Dunec, did not appraise the properties himself and lacked comparable experience with LIHTC partnerships.[215] At his deposition, he did not recall what a Housing Assistance Payment ("HAP") contract was, despite those contracts being central to the income and risk profile of these projects.[216] Lines explained that all the LIHTC properties had HAP contracts, which provided stable, government-backed income streams and justified his use of market-rate capitalization rates.[217]

Dunec's criticisms of Lines's appraisals were often unsupported. For example, he assigned Federation Towers Land a value of zero, claiming it was merely a leased parking lot, but ignoring that the lease was terminable and the land had significant redevelopment value.[218] He similarly valued Federation Weinberg at only $100,000, even though it was a fully occupied apartment building producing substantial rent.[219]

Dunec also applied a significant additional discount for lack of marketability at the level of Tatum's ownership, a choice that accounts for the majority of the valuation gap between the experts. That approach was inconsistent with Tatum's contractual right to receive ongoing distributions from the deals—not merely to sell

[215] Dunec Tr. 1378–81, 1385.

[216] Dunec Tr. 1387–89.

[217] Lines Tr. 517–20, 552–54.

[218] Lines Tr. 543–46; Kreinik Tr. 1326–27; JX 5019 at '286 §§ 2.3, 3.2.

[219] Lines Tr. 546–49; JX 5261 at '396; JX 2146 at '053–054.

his interest.[220] Kalsi properly applied a 28% aggregate discount for lack of control and lack of marketability at the Fairstead level, without applying any additional marketability discount at the level of Tatum's ownership, precisely because Tatum was entitled to an undiscounted income stream.[221] CohnReznick's analysis properly values the cash flows Fairstead converted.

### iii. Tatum's Argument For Vested Deals

Tatum finally argues that the court should use its equitable discretion to also award him the value of all Vested Deals. Tatum is only entitled to expectation damages for breach of the Vested Interest Provision, and that means only his share of the value of Stabilized Deals.

To claim a right to Vested Deals, Tatum contends that Feldman and Goldberg misled him by making false promises about a broader restructuring, only to secretly abandon that effort, fabricate accusations of misconduct, and frustrate his efforts to resign. Tatum maintains that had he known the truth, he would have resigned "for Good Reason" and possessed a right to the value of Vested Deals.

Just as Fairstead cannot retroactively recharacterize Tatum's resignation as a termination for cause, Tatum cannot retroactively recharacterize his resignation as a resignation for Good Reason. Tatum resigned "without Good Reason" in October

[220] Kalsi Tr. 649; JX 5280 § 8.8(b); Goldberg Dep. 1005, 1038.

[221] Kalsi Tr. 612–13, 648–53, 649; Goldberg Dep. 1038, 1121.

56

2021.[222] He reaffirmed his resignation without Good Reason in March and April 2022.[223] Tatum claims he did not know about Fairstead's misrepresentations, but Tatum was deeply skeptical of Feldman and Goldberg by March 2021. Certainly by October 2021, when Blodgett was terminated for cause, Tatum already knew enough to resign for Good Reason. He made a different decision and must stand by it.

### 2. Tatum's Claim For Breach Of The Appraisal Provision

Tatum next contends that Fairstead breached a provision in the Operating Agreement that established a mechanism for appraising his interests (the "Appraisal Provision"). Tatum proved that claim and is entitled to damages.

### a. Breach Of The Appraisal Provision

The Appraisal Provision states:

> Upon any termination of Employment of, or by, Tatum, any Member other than [Tatum] (the "Purchasing Member") may, or may cause its designee to, purchase from [Tatum] all of the Interests then held by [Tatum] for a purchase price equal to the Appraised Value (as defined below) of such Interests as of the date on which the notice of such election is sent to JCT.[224]

The Appraisal Provision establishes a mechanism under which Tatum and the Purchasing Member each designate appraisers.[225]

---

[222] JX 1016.

[223] JX 1071; JX 1093.

[224] JX 5280 § 8.9(a).

[225] *Id.* § 8.9(b).

On April 5, 2022, Fairstead exercised its rights under the Appraisal Provision.[226] Each side provided a list of Stabilized Deals.[227] Each side designated its appraiser.[228] But Fairstead did not respond to Tatum's requests for valuation documents or meet other contractual deadlines.[229] Instead, Fairstead made a lowball settlement offer that Tatum rejected. Fairstead breached the Appraisal Provision by failing to comply with its terms. Fairstead contends that Tatum did not act in good faith, but the record does not support that assertion. It was Fairstead who changed positions on the basis for Tatum's departure and abandoned the appraisal process. Tatum is entitled to damages for that breach.

### b.     The Remedy For Breach Of The Appraisal Provision

A remedy for breach of contract should seek to give the non-breaching party the benefit of its bargain.[230] "In Delaware, the traditional method of computing damages for a breach of contract claim is to determine the reasonable expectations of the parties."[231] "This principle of expectation damages is measured by the amount of

---

[226] JX 1090; *see* Feldman Dep. 499–505.

[227] *See* JX 1090; JX 1093 at '006.

[228] JX 1111; JX 5323.

[229] *See* JX 1134.

[230] *In re Dura Medic Hldgs., Inc. Consol. Litig.*, 333 A.3d 227, 255 (Del. Ch. 2025).

[231] *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at \*29 (Del. Ch. July 20, 2007), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE).

money that would put the promisee in the same position as if the promisor had performed the contract."[232]

The Appraisal Provision provides that Tatum and Fairstead "shall pay, on a pro rata basis (according to their relative Membership Interests), the fees and expenses of the appraisers."[233] Fairstead formally elected its repurchase rights and was therefore obligated to pay 94.75% of the "fees and expenses of the appraisers." Tatum incurred costs for an appraiser, and Fairstead never bore its share. Fairstead therefore owes Tatum 94.75% of $321,000, which equals $304,147.50.[234]

### 3. Tatum's Claim For Breach Of The Good Faith Provision

In his final claim for breach of the Operating Agreement, Tatum contends that Feldman and Goldberg caused JD2 Affordable and FCM Affordable to breach a provision requiring that members act in good faith (the "Good Faith Provision"). Tatum proved a breach and is entitled to damages.

#### a. Breach Of The Good Faith Provision

The Good Faith Provision states that each member must "act honestly and in good faith in its dealings with the Company and the other Members."[235] Tatum failed to prove that Feldman and Goldberg breached the Good Faith Provision by making

---

[232] *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).

[233] JX 5280 § 8.9(b).

[234] CohnReznick billed Tatum an additional $168,299 for depositions and trial related work. The court declines to award that fee.

[235] JX 5280 § 6.10(b).

promises about an equity restructuring, but he proved that Feldman and Goldberg breached by making Tatum run the gauntlet during his departure.

### i. A Contractual Obligation Versus A Fiduciary Duty

Some Delaware authorities have collapsed the difference between a contractual obligation and a fiduciary duty by asserting that "a contractual duty to refrain from 'willful misconduct' or 'bad faith' corresponds with the traditional duty of loyalty."[236] That is not accurate. When an alternative entity eliminates fiduciary duties, it has eliminated fiduciary duties. It may replace those duties with a contractual provision that uses a comparable term, but the resulting obligation is contractual, not fiduciary. [237] Even if the court imbues the contractual obligation with substantive content by looking to the content of a comparable fiduciary obligation,

---

[236] *In re Cadira Gp. Hldgs., LLC Litig.*, 2021 WL 2912479, at *11 (Del. Ch. July 12, 2021); *see Smith v. Scott*, 2021 WL 1592463, at *10 (Del. Ch. Apr. 23, 2021) (asserting that contractual language prohibiting "bad faith," "willful misconduct," and "gross negligence" re-establishes the traditional fiduciary duties of loyalty and care). The *Cadira* decision cites *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021 (Del. Ch. June 23, 2015), to support equating contractual duties with fiduciary duties, but *CMS* involved an LLC that had not eliminated traditional fiduciary duties, so the traditional duties applied. *Id.* at *18.

[237] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 194 (Del. Ch. 2014) ("A provision of a limited partnership agreement might turn on a particular state of mind, but the inclusion of requisite mental state for compliance with a provision is not the same as creating a fiduciary relationship or re-introducing fiduciary duties that have been eliminated."), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *21 (Del. Ch. June 12, 2014) ("When an alternative entity eliminates all fiduciary duties, then all fiduciary duties have been eliminated," even if "the alternative entity agreement might well include a contractual duty to disclose").

the obligation remains contractual. For example, a contractual provision might state that a manager must use due care. A court could look to fiduciary law to hold that the standard for measuring a failure to use due care is gross negligence.[238] But the plaintiff must still prove a claim for breach of contract; fiduciary concepts like standards of review do not apply.[239]

The Operating Agreement provides that "JCT shall owe fiduciary duties to the Company and the other Members" but eliminates fiduciary duties for the other members.[240] Feldman and Goldberg's obligations are purely contractual. The Operating Agreement introduces a contractual requirement that each member must act in "good faith," without any qualifier and without defining "good faith." The court can look to fiduciary law to draw content for this contractual obligation, but the obligation remains contractual.

"When a contract governed by Delaware law calls upon a party to act or make a determination in good faith, without any qualifier, it means that the party must act

---

[238] *See also, e.g.*, *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) (where LLC agreement eliminated fiduciary duties but imposed liability for bad faith actions and improper self-dealing, "[t]hose duties are contractual in nature, but to the extent they employ undefined terms such as 'bad faith,' the common law fiduciary duties are instructive in supplying the definition").

[239] *El Paso Pipeline P'rs*, 2014 WL 2768782, at *19 ("Because the LP Agreement eliminates all fiduciary duties, the fiduciary duty precedents do not control.").

[240] JX 5280 § 6.10(a).

in subjective good faith."[241] For example, a limited partnership agreement that eliminates fiduciary duties and introduces a contractual obligation to act in good faith imposes a subjective standard.[242] The court cannot read minds, so it must infer an individual's subjective intent to act in good faith from external indications.[243]

In the fiduciary context, good faith requires a partner in a limited partnership to act honestly and subjectively seek to promote the best interests of the partnership. Stated in the contrapositive, a partner acts in bad faith when acting dishonestly or with a purpose other than advancing the best interests of the partnership.[244] These principles apply equally to a contractual obligation that requires members of an LLC to act in good faith.

### ii.   The Allegedly False Promise Of Equity

Tatum contends that Feldman and Goldberg breached the Good Faith Provision by making a false promise about an equity restructuring that induced Tatum to stay at Fairstead Affordable while preserving their own equity stakes. To

---

[241] *Fox v. CDX Hldgs., Inc.*, 2015 WL 4571398, at *25 (Del. Ch. July 28, 2015), *aff'd*, 141 A.3d 1037 (Del. 2016).

[242] *E.g.*, *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104–06 (Del. 2013); *El Paso Pipeline GP*, 113 A.3d at 174, 178.

[243] *El Paso Pipeline GP*, 113 A.3d at 178.

[244] *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1195 (Del. Ch. 2025).

act in good faith, Feldman and Goldberg were required to act honestly and seek to promote the best interests of Fairstead Affordable and its members as a whole.

The factual record shows that Goldberg did not breach that obligation when discussing equity with Tatum. He did promise Tatum equity, but he said that an equity restructuring would not happen until 2021. Tatum and Blodgett preempted the timeline by choosing to seek an earlier equity restructuring. Nothing prohibited them from asking for an acceleration of the timeline. But their ask does not change the fact that Goldberg promised an equity restructuring in 2021.

Consistent with his promise, Goldberg began implementing the LTIP in January 2021. The LTIP was not the handover of equity and control that Tatum and Blodgett wanted, but it contemplated awards of equity. Tatum failed to prove that the promise about an equity restructuring breached the Good Faith Provision.

### iii.    The Departure Gauntlet

Tatum separately argues that Feldman and Goldberg breached the Good Faith Provision by making his departure as lengthy, painful, and costly as possible. The record supports Tatum's claim. To act in good faith, Feldman and Goldberg were required to act honestly and seek to promote the best interests of Fairstead Affordable. Instead, Feldman and Goldberg maneuvered opportunistically and sought to harm Tatum, even if it would not benefit Fairstead Affordable.

When Fairstead exercised its right to repurchase Tatum's equity interests, Feldman and Goldberg did not respond to Tatum's requests for valuation documents. They did not meet other contractual deadlines. Instead of following the valuation

process under the Operating Agreement, they conveyed a lowball buyout offer. These tactics did not promote the best interests of Fairstead Affordable and its members. It was an intentional breach of the Operating Agreement that put Fairstead Affordable at risk.

After Tatum rejected the buyout offer, Feldman and Goldberg purported to retroactively assign cause to Tatum's termination and declared that Tatum's equity interests were forfeited. They grounded the retroactive for-cause termination on Tatum and Blodgett's plan to leave Fairstead and start a new company. That was not a good faith act. Feldman and Goldberg knew the relevant details about Tatum and Blodgett's plans when they accepted Tatum's resignation. Goldberg admitted that Fairstead only decided to take this hardline position after Tatum declined the offer. When recharacterizing Tatum's termination, Feldman and Goldberg sought to manufacture a dishonest reason to harm Tatum, not to act honestly and in the best interests of Fairstead Affordable.

Tatum proved that Feldman and Goldberg breached their contractual obligation to act in good faith by making him run the departure gauntlet. He is entitled to a remedy.

### b.     The Remedy For Breach Of The Good Faith Provision

Tatum can recover damages for Feldman and Goldberg's breach of the Good Faith Provision. The court has "broad latitude to exercise its equitable powers to craft

a remedy."[245] The American Rule generally prevents a party from recovering fees and expenses as damages, but there are exceptions to the general rule.[246] The court has discretion to award attorneys' fees as damages in certain circumstances.[247] The bad faith exception permits the recovery of attorneys' fees as damages if the underlying, pre-litigation conduct of the losing party was sufficiently egregious.[248] The record shows that Feldman and Goldberg acted in bad faith during Tatum's departure from Fairstead. Tatum is entitled to an award of attorneys' fees for the amounts he incurred litigating the Good Faith Provision claim. If the parties cannot agree on an amount, Tatum may move to quantify the fee award.

## B.    Tatum's Claim For The Legacy Portfolio

Tatum contends that Fairstead owes him a share of the promote for the Legacy Portfolio under principles of promissory estoppel. He proved that claim and is entitled to damages.

The parties agree that New York law governs this claim. Under New York law, promissory estoppel has three elements: "a clear and unambiguous promise; a

---

[245] *Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993); *accord Berger v. Pubco Corp.*, 976 A.2d 132, 139 (Del. 2009); *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008).

[246] *Goldenberg v. Immunomedics, Inc.*, 2021 WL 1529806, at *19 (Del. Ch. Apr. 19, 2021).

[247] *Nevins v. Bryan*, 885 A.2d 233, 255 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005).

[248] *Goldenberg*, 2021 WL 1529806, at *19.

reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of the reliance."[249] Tatum proved each element.

First, Tatum proved that Goldberg unambiguously promised Tatum a share of the promote for the Legacy Portfolio. Tatum and Blodgett testified credibly, and a contemporaneous document provides corroboration.[250] That model calculated Tatum's 5.25% interest in the promote as $1,077,140.81.[251]

Second, Tatum reasonably and foreseeably relied on Goldberg's promise. Tatum did not want to work on the Legacy Portfolio. He did so only because Goldberg promised him a share of the promote.

Third, Tatum was injured. He worked on the Legacy Portfolio without any compensation. Otherwise, he would have worked on Fairstead Affordable deals for which he stood to receive equity.

Fairstead argues that Tatum cannot recover because he was obligated to work on the Legacy Portfolio under the terms of his Employment Agreement. The operative provision states:

> You are being employed as a real estate director responsible for directing the acquisition and execution activities of Fairstead Affordable and to provide all other work and services assigned to you, including, but not limited to services for [JD2 Realty Management LLC], its direct or

---

[249] *Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 594 (2d Cir. 2014).

[250] Tatum Tr. 89–90; Blodgett Tr. 699–701; *see* JX 336; JX 339.

[251] JX 330 at '002 ("Summary" sheet, cell D43).

indirect, principals, affiliates, parent or subsidiary entities, and any and all company or companies owned by or related to [JD2 Realty Management LLC] or its direct or indirect principals ("Related Entities").[252]

That language contemplates work for Fairstead Affordable and its affiliates, but not for projects wholly unrelated to Fairstead Affordable, like the Legacy Portfolio. Tatum is entitled to $1,077,140.81 in damages for his share of the promote, equal to the amount that Fairstead calculated.

## C. Tatum's Claim For The Hampstead Portfolio

Tatum separately contends that Fairstead owes him a share of the promote for the Hampstead Portfolio under principles of unjust enrichment. He proved that claim and is entitled to damages.

"To prevail on a claim of unjust enrichment, a plaintiff must prove that the defendant received a benefit at plaintiff's expense and that retention of that benefit would be unjust."[253] Tatum proved both elements of unjust enrichment.

Tatum brokered the acquisition of the Hampstead Portfolio and received a 9% share of the promote.[254] Feldman and Goldberg told Tatum that they wanted to restructure Fairstead Affordable so that all of his equity compensation would be tied

---

[252] JX 80 § 1(A).

[253] *Thayer v. Dial Indus. Sales, Inc.*, 189 F. Supp. 2d 81, 91 (S.D.N.Y. 2002) (internal quotation marks omitted).

[254] JX 174.

67

to that entity. In anticipation of the restructuring, they asked Tatum to transfer his share of the Hampstead Portfolio promote to Fairstead Affordable. Tatum agreed.

Feldman and Goldberg never increased Tatum's interest in Fairstead Affordable to reflect the transfer. He went from having a 100% interest in 9% of the promote to only having a 5.25% interest in 9% of the promote.

The transfer enriched Feldman and Goldberg because it gave them a 94.75% interest in an asset—the 9% interest in the promote—where they previously had zero interest. Tatum was impoverished by the same amount. Feldman and Goldberg promised that they would account for the transfer of the 9% interest as part of the overall equity restructuring, but that never happened. Their retention of these benefits would be unjust. They induced Tatum to roll over his interest in the Hampstead Portfolio promote to Fairstead Affordable, but he received nothing in return.

Tatum is entitled to the value of his 5.25% interest in the Hampstead Portfolio promote. Fairstead's contemporaneous records valued the Hampstead Portfolio promote at $9,853,038.[255] Tatum is entitled to damages of $517,284.

## D.    The Counterclaim For Breach Of The Employment Agreement

In its first counterclaim, Fairstead asserts that Tatum breached his Employment Agreement by secretly partnering with Blodgett to take control of

---

[255] JX 1168 at '002.

Fairstead or launch a competing company, and by downloading, retaining, and using Fairstead's confidential information.

The Employment Agreement contains a choice-of-law provision selecting New York law.[256] To prevail on a breach of contract claim under New York law, the claimant "must establish the existence of a contract, the party's own performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach."[257] "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."[258] "The best evidence of what parties to a written agreement intend is what they say in their writing."[259] Thus, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[260]

The Employment Agreement required that Tatum "devote [his] best efforts and time, effort and loyalty" to his employer and "discharge all of [his] duties . . . in good faith" (the "Best Efforts Provision").[261] It also required that Tatum refrain from

---

[256] JX 80 § 4(C).

[257] *Adirondack Classic Design, Inc. v. Farrell*, 122 N.Y.S.3d 790, 793 (App. Div. 2020).

[258] *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

[259] *Id.* (internal quotation marks omitted).

[260] *Id.*

[261] JX 80 § 1(H).

"conduct that creates . . . conflict between [his] personal interests and [Fairstead's] interests" (the "No Conflict Provision").[262] Finally, the Employment Agreement required that Tatum "not reveal to any person or entity any of the trade secrets or proprietary or confidential information of [Fairstead]" (the "Confidentiality Provision").[263]

### 1. Fairstead's Claim For Breach Of The Best Efforts Provision

Fairstead contends that Tatum breached the Best Efforts Provision by secretly partnering with Blodgett to take control of Fairstead or launch a competing company. Fairstead failed to prove that Tatum breached the Best Efforts Provision.

The Best Efforts Provision states:

> As an employee of the Firm, you agree to (a) devote your best efforts and time, effort and loyalty to the business of the Firm, the Related Entities and its affiliates; (b) discharge all of your duties and responsibilities that are or may be assigned to you by the Firm or any Related Entities conscientiously, in good faith and to the best of your ability, giving the Firm and the Related Entities the full benefit of your knowledge, expertise, skill and judgment . . . .[264]

The Best Efforts Provision required Tatum to devote his "best efforts" to his duties and responsibilities as a Fairstead employee. It essentially required Tatum to do his best to advance Fairstead's business.

---

[262] *Id.*

[263] *Id.* § 3(A)(1).

[264] *Id.* § 1(H).

The record shows that Tatum devoted his best efforts as a Fairstead employee. Before Tatum joined Fairstead, no one there knew how to do a tax credit deal. He built a new segment of the business from scratch. When Blodgett and Goldberg asked Tatum to work on two additional projects, he agreed and devoted his knowledge, expertise, skill, and judgment to those projects as well. Tatum renovated the Legacy Portfolio in record time and put together a refinancing to Feldman's benefit. He oversaw the acquisition of the Hampstead Portfolio. He also reached out to a compensation consultant to advise Fairstead. Nothing in the record indicates that Tatum failed to do his best as a Fairstead employee. He worked hard to build and manage Fairstead Affordable and the Tax Credit Business and added value for additional projects.

Tatum's efforts to develop the plans for Restructured Fairstead and the Separate Company did not translate into a lack of his best efforts as a Fairstead employee. Fairstead did not point to any credible evidence suggesting a decline in Tatum's productivity as an employee. Tatum continued to do his job and do it well.

Subjectively, Tatum always preferred the option of continuing to work at Fairstead. He and Blodgett only developed their plan for the Separate Company as a backup if Feldman and Goldberg refused to restructure Fairstead Affordable. Tatum did not breach the Best Efforts Provision by making fallback plans to leave as long as he continued to devote his best efforts to Fairstead Affordable. While Tatum was discussing options with Blodgett, Tatum continued to do that.

Tatum also did not want his departure to harm the company. He promised Goldberg that he would help Fairstead should things end, and he proposed that they work together on a transition plan. When Fairstead insisted that Tatum work through his notice period, Tatum did. He worked diligently for Fairstead until his last day at the company. He thought he left on good terms. Tatum wanted to continue working with Fairstead, even in a new venture.

For these reasons, Fairstead failed to prove that Tatum breached his contractual duties under the Best Efforts Provision.

### 2. Fairstead's Claim For Breach Of The No Conflict Provision

Fairstead next contends that Tatum breached the No Conflict Provision. Fairstead points to the same underlying conduct and contends that Tatum put himself in conflict with Fairstead by exploring the possibilities of Restructured Fairstead and the Separate Company. Fairstead again failed to prove a breach.

The No Conflict Provision states:

As an employee of the Firm, you agree to . . . (f) not engage in any conduct that creates an actual, potential or apparent conflict between your personal interests and the Firm's interests or any Related Entities interests, or which otherwise may adversely affect your judgment or ability to interact in the best interests of the Firm or any Related Entities.[265]

---

[265] *Id.*

Fairstead contends that the No Conflict Provision precluded Tatum from doing anything to plan to leave the company because his personal interest in leaving the company conflicted with Fairstead's desire to have him stay.

If read as broadly as Fairstead seeks, the No Conflict Provision would preclude a wide range of permissible conduct. An employee could not ask for a raise, because that request would put the employee's personal interest (gaining higher compensation) at odds with the company's interest (keeping costs lean). An employee could not ask for additional time off, because doing so would put the employee's personal interest (time off) at odds with the company's interest (having the employee work as much as possible). And the provision would prevent an employee from doing anything to look for a new job, even if the employee's efforts did nothing to harm the company or interfere with the employee's duties. Such an interpretation would constitute a radical restriction on personal freedom. It is hard to imagine public policy allowing such a restriction, much less a court of equity enforcing it.

The No Conflict Provision does not sweep so broadly. It seeks to address standard employee conflicts of interest, like contracting with a more expensive supplier who gives the employee baseball tickets rather than a cheaper supplier who doesn't. The restriction does not go further and bar the employee from making legitimate preparations to compete.

Fairstead failed to prove that Tatum put himself in an actual, potential, or apparent conflict with Fairstead by working on a potential restructuring or considering a new venture with Blodgett. As with the analysis of the Best Efforts

73

Provision, Tatum did nothing that harmed Fairstead or impaired his ability to carry out his duties. Fairstead failed to prove a breach of the No Conflict Provision.

### 3. Fairstead's Claim For Breach Of The Confidentiality Provision

Fairstead last contends that Tatum breached the Confidentiality Provision. Fairstead proved that Tatum breached the provision by downloading and retaining documents but failed to prove any compensable damages beyond the cost of the forensic investigation.

### a. Breach Of The Confidentiality Provision

Fairstead contends that Tatum breached the Confidentiality Provision by downloading and retaining documents. He did, and that constituted a breach.

The Confidentiality Provision states:

> At all times, both during your employment and after its termination, you agree that you will not reveal to any person or entity any of the trade secrets or proprietary or confidential information of the Firm or any Related Entities or any third party . . . and you shall keep secret all matters entrusted to you and shall not use or attempt to use any such information in any manner, except as may be required in the ordinary course of performing your duties as an employee of the Firm.[266]

The same provision later states:

> While you are an employee of the Firm, you shall not take from the premises of the Firm or from any of the Related Entities, use or permit to be used any Proprietary Information other than for the benefit of the Firm. You shall not, after the termination of your employment with the Firm, use or permit to be used any Proprietary Information, notes, memoranda, files, letters, lists, emails, reports, lists, records, specifications, software programs, data, documentation or other written, photographic, electronic or other tangible materials containing Proprietary Information, it being agreed that all of the foregoing will be

---

[266] *Id.* § 3(A)(1).

and remain the sole and exclusive property of the Firm and such Related Entities and that immediately upon the termination of your employment with the Firm for any reason, you will deliver all of the foregoing, and all copies thereof, to the Firm at its main office. After such delivery, you shall not retain any such records or copies thereof or any such tangible property.[267]

Tatum admits that after Blodgett's meeting with Feldman went poorly, he "panicked" and downloaded Fairstead documents.[268] That act breached the Confidentiality Provision.

### b. The Remedy For Breach Of The Confidentiality Provision

Although Tatum's downloading breached the Confidentiality Provision, Fairstead failed to prove any damages other than the costs incurred investigating Tatum's actions. The nature of the documents and Tatum's decision to return them without using them defeats any more significant award.

Tatum first downloaded a large volume of documents on May 8, 2021. Those documents related overwhelmingly to diligence materials for deals, with only nine documents addressing other matters.[269] Tatum next downloaded documents on May 18. He accessed a folder that predominantly contained personal documents, but also contained some Fairstead documents that Tatum kept there so they remained confidential. Tatum downloaded more documents on June 29, but they were solely personal documents.

---

[267] *Id.* § 3(A)(3).

[268] Tatum Tr. 137.

[269] JX 5260.

On January 18, 2022, Tatum returned the USB drive he used. He returned all of the Fairstead documents except for two categories. The first consisted of valuation materials relating to Fairstead Affordable and the employee co-investment vehicle, which Tatum correctly believed he could retain given his status as a member. The second consisted of photographs of communications about his annual reviews, the promised restructuring, and his transition efforts, which Tatum kept to defend himself if litigation ensued.

There is no evidence that Tatum used any of the materials for any purpose other than this litigation. There is no evidence that Tatum's retention and use of the documents harmed Fairstead. At trial, Tatum's counsel asked the Fairstead witnesses to identify competitively sensitive documents that Tatum improperly retains today. They pointed to only a single item: a photograph of the first page of a document titled "FA Process."[270] That photograph is not significant.

Fairstead also failed to prove that Tatum misused any of the Fairstead documents that he did not retain. The record at trial showed that much of the information is publicly available. LIHTC general partners are effectively government contractors. As a result, LIHTC underwriting models are publicly available.[271] Information about Feldman and Goldberg's net worth is also publicly available. Many

---

[270] JX 1454 at '009–011.

[271] *See, e.g.*, JX 5319; JX 5232; JX 5233; JX 5234; JX 5320; JX 5325; JX 5326; JX 5327.

of the documents Tatum downloaded are curated files of "know-how" that are not truly confidential.[272]

The expert testimony does not support the assertion that Tatum used or disclosed any documents. Tatum's expert opined that he had not.[273] Fairstead's expert agreed that the last accessed date for most of the documents was when they were downloaded onto the USB.[274] Fairstead's expert offered no opinion about whether Tatum transferred the documents to another device. While it is theoretically possible that Tatum did this, Tatum credibly denied it, and Fairstead offered no proof.

Fairstead's contemporaneous actions also evidence the lack of any significance to the breach. On June 24, 2021, Fairstead learned about Tatum's downloading activity.[275] On June 30, Fairstead's principals strategized about how to use that in the "NewCo" negotiations.[276] They did not ask Tatum about his downloading activity, preferring for "business reasons" to investigate first.[277] In August, Fairstead's outside

---

[272] *See Pfizer, Inc. v. ICI Ams., Inc.*, 1984 WL 8282, at *8 (Del. Ch. Nov. 21, 1984) (information classified as "know-how" is only protectible if the information has been maintained as confidential, is not generally known by others, and cannot be readily ascertained through other means).

[273] *See* JX 1016; JX 1358 (downloading analysis); JX 5299 (USB analysis).

[274] *See* JX 5299.

[275] JX 614.

[276] JX 5339 at '005 ("Consider whether/how to handle bad behavior (stealing documents, etc.)"; "Penalty provisions tied to existing equity provisions?").

[277] JX 5106.

counsel recommended telling Tatum about the investigation.[278] But Feldman and Goldberg decided against it.[279] They finally told Tatum about the investigation on December 23, but overstated the findings.[280] If Tatum's downloading threatened Fairstead or caused real harm, Feldman and Goldberg would have acted differently.

Fairstead therefore failed to prove that Tatum's downloading and retention of documents caused Fairstead any material harm. But Tatum's breach did warrant a forensic investigation, and Fairstead spent $155,384.73 conducting it.[281] Tatum must bear that cost.

## E.     The Counterclaim For Breach Of The Operating Agreement

In its next counterclaim, Fairstead asserts that Tatum breached two provisions of the Operating Agreement. Fairstead asserts that Tatum breached the Good Faith Provision by secretly working with Blodgett to gain control of Fairstead or start a competing business using Fairstead's resources, by soliciting other Fairstead employees to leave the company and join his new venture with Blodgett, and by misappropriating Fairstead's confidential information. Fairstead also asserts that Tatum breached the confidentiality provision in the Operating Agreement by

---

[278] *See* JX 5104; JX 5106.

[279] *See* JX 851; JX 919.

[280] JX 978.

[281] JX 5265 at '036–038.

78

downloading and retaining Fairstead's confidential information. Fairstead failed to prove that Tatum breached either provision.

### 1.    Fairstead's Claim For Breach Of The Good Faith Provision

To act in good faith, Tatum was required to seek to promote the best interests of Fairstead Affordable and its members. Fairstead failed to prove that Tatum breached that contractual obligation.

### a.    Restructured Fairstead And The Separate Company

Fairstead contends that Tatum and Blodgett used "fearmongering" and "threats" to attempt a "hostile takeover," and if that failed, they planned to launch a competing business. Tatum did not attempt a "hostile takeover" of Fairstead. Tatum's written proposals show what he hoped to accomplish. "Plan A" was an equity restructuring resulting in Restructured Fairstead. "Plan B" was to start a new Separate Company with Blodgett. He wanted to continue working with Fairstead, even in the new venture. Fairstead failed to prove that Tatum breached the Good Faith Provision by exploring "Plan A" and "Plan B."

Tatum did not act dishonestly or in bad faith when exploring "Plan A" and "Plan B." His main contribution was to prepare some documents to help Blodgett raise funds.[282] He also scheduled a meeting with the Tisch Office using his Fairstead email account and with assistance from Blodgett's executive assistant.[283] Those

---

[282] JX 530.

[283] *See* JX 295; JX 297.

79

efforts, however, were about a potential restructuring that Goldberg had encouraged Blodgett to explore.[284] Although Goldberg disclaimed being involved at trial, the contemporaneous record shows that he knew about and supported Blodgett's efforts to develop a restructuring that might be acceptable to Feldman, including by bringing in capital from the Sussman and Tisch Offices.[285] Those initiatives were consistent with Goldberg's own suggestion to consider bringing in "third party capital."[286] None of Tatum's efforts harmed the interests of Fairstead Affordable and its members.

Tatum also did not actually start a competing company. In spring 2021, Tatum and Blodgett discussed leaving Fairstead. After Feldman rejected Blodgett's proposal on June 2, 2021, Tatum and Blodgett discussed working together once any non-compete periods expired. But Tatum never joined Blodgett's new venture. Tatum did not breach his contractual obligation to act in good faith toward Fairstead Affordable and its members by exploring the possibility of a separate company.

Fairstead observes that in September 2021, Tatum met with a potential investor.[287] That meeting was not a violation of the Good Faith Provision either. At the time, Tatum and Blodgett believed they were on the verge of reaching agreement on a joint venture with Feldman and Goldberg.

---

[284] Tatum Tr. 48, 273–92.

[285] *See* Tatum Tr. 99–103, 289; Blodgett Tr. 720–22.

[286] JX 337 at '003.

[287] Tatum Tr. 428–30; JX 2129.

Even after Tatum resigned, he took steps to ensure that his departure would not harm the company. He developed a transition plan with Goldberg and implemented it.[288]

Fairstead failed to prove that Tatum's actions breached the Good Faith Provision.

### b.     The Alleged Solicitation Of Fairstead Employees

Fairstead next contends that Tatum breached the Good Faith Provision by inducing Kreinik and Sussi to leave. To the contrary, Tatum tried to warn Goldberg that employees were unhappy and on the verge of leaving.[289]

Kreinik joined Fairstead "at the word of Jeff Goldberg," who said that Kreinik would be given equity as a part of his compensation. Years later, by the time of Kreinik's resignation, Kreinik had been promised "significant equity" "multiple times" and these promises "weren't delivered."[290] Kreinik resigned because these promises remained unfulfilled and "it didn't seem like there was a path forward."[291]

---

[288] *See* JX 750; JX 5308; Tatum Tr. 171–84.

[289] *See* JX 154 (Tatum asking Goldberg if he wants "partners" or "employees" and that Goldberg should adopt the partner model because "[i]t's market and if people don't get it here, the best ones will leave.").

[290] Kreinik Tr. 1299–301; *see* JX 398 at '002 (Kreinik on March 31, 2021: "Trying to figure out how underpaid I am").

[291] Kreinik Tr. 1303.

Kreinik had "wanted to resign for quite some time" but held off to ensure a smooth transition.[292]

Sussi's experience was similar. Goldberg told Sussi that he would receive equity compensation,[293] and Sussi felt that he was unfairly compensated.[294] He left because he felt Goldberg did not fulfill his promises.

Fairstead did not prove that Tatum caused Kreinik or Sussi to leave Fairstead. The evidence showed instead that Feldman and Goldberg caused their own employees to leave by failing to give them equity compensation and treating them poorly. Since 2022, every Fairstead executive has left, except for Feldman, Goldberg, and Hoffman. The departures include Tatum's two successors as the head of acquisitions and development, two Chief Financial Officers, and the leaders of Construction, Capital Markets, Property Management, Marketing, and Human Resources.[295]

To prove a breach of contract, a plaintiff must prove that the breach caused compensable harm. Fairstead failed to prove a breach. Fairstead also failed to prove causation. Kreinik and Sussi were going to leave no matter what Tatum did.

---

[292] JX 755.

[293] Tatum Tr. 117.

[294] JX 478 (Sussi on May 22, 2021: "We're like the pop star that[] gets pilfered by their manager"); Blodgett Tr. 693–94.

[295] Feldman Tr. 1194–97.

Fairstead failed to prove that Tatum breached the Good Faith Provision by soliciting Fairstead employees.

### c. The Alleged Misappropriation Of Confidential Information

Fairstead failed to prove that Tatum breached the Good Faith Provision by misappropriating confidential information. Because the Confidentiality Provision in the Employment Agreement directly addresses this topic, this decision has used that provision to analyze Tatum's downloading of information. As discussed in that context, Tatum downloaded and retained documents, but he did not misuse any of the information. Fairstead also failed to prove that Tatum used or disclosed any of the confidential information that Blodgett and Kreinik separately downloaded. The Good Faith Provision did not impose any obligations beyond the obligations that the Confidentiality Provision imposed. At best, assuming breach, Fairstead would be entitled to the expenses it incurred investigating Tatum's actions, which this decision has already awarded. No further relief is warranted.

### 2. Fairstead's Claim For Breach Of The Confidentiality Provision

Fairstead separately asserts a breach of a more general confidentiality provision that appears in the Operating Agreement. That provision states, subject to exceptions, that "no Member or any of its affiliates shall disclose or use any confidential information of or with respect to the Company or its business."[296]

---

[296] JX 5280 § 8.3(b). The exceptions permit use of confidential information "(i) to the extent that it legally is or becomes part of public or industry knowledge from authorized sources other than a Member or any Affiliate of any Member, (ii) which

This decision previously used the Confidentiality Provision in the Employment Agreement to analyze Tatum's conduct. The provision in the Operating Agreement is more general and requires that a party "disclose or use" confidential information. As discussed, that did not happen. Fairstead did not prove any breach of the general confidentiality obligation in the Operating Agreement.

## F. The Counterclaim For Tortious Interference

In a final contract-related claim, Fairstead sought to prove that Tatum tortiously interfered with Kreinik's employment agreement. Fairstead failed to prove this claim.

Delaware follows the Restatement (Second) of Torts when analyzing a claim for tortious interference with contract.[297] Generally, "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other."[298] Reframed as elements, a plaintiff must plead: (1) a contract, (2) the defendant's knowledge of it, and (3) an intentional act that is a significant factor in causing a breach of the contract, (4) done without

---

the Member or any of its Affiliates is required by law to disclose (but only to the extent required to be so disclosed), or (iii) in case of any use by the Members, such use is necessary or appropriate in the conduct of the Company's business." *Id.*

[297] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010).

[298] Restatement (Second) of Torts § 766 (A.L.I. 1979).

justification, (5) that causes injury.[299] Without an underlying breach of contract, a tortious interference claim is not viable.[300]

The intentional act causing the breach need not be tortious, only intentional.[301] An independently tortious method of interference makes a finding of improper interference more likely, so "the nature of [the] conduct is an important factor," but a tortious method of interference is not required.[302]

Fairstead contends that Kreinik breached his employment agreement in two ways. First, Fairstead contends that Kreinik competed with the company by working on Restructured Fairstead. Second, Fairstead contends that Kreinik used its confidential information when preparing financial models for Restructured Fairstead. Fairstead contends that Tatum caused Kreinik to breach his employment agreement by directing and supervising Kreinik's work on Restructured Fairstead.

The first two elements of the tortious interference claim are easily satisfied. The contract was Kreinik's employment agreement,[303] and Tatum knew it existed.[304]

---

[299] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

[300] *See STX Bus. Sols., LLC v. Fin.-Info.-Techs., LLC*, 2024 WL 4645104, at *6 (Del. Ch. Oct. 31, 2024), *aff'd*, 342 A.3d 399 (Del. 2025) (TABLE).

[301] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2024 WL 4115729, at *38 (Del. Ch. Sept. 9, 2024); Restatement (Second) of Torts, *supra*, § 766 cmt. c.

[302] Restatement (Second) of Torts, *supra*, § 766 cmt. c.

[303] JX 62.

[304] *E.g.*, Tatum Tr. 417; JX 641.

But Fairstead failed to prove that Tatum engaged in any intentional acts that were a significant factor in causing a breach of the competition or confidentiality restrictions in Kreinik's employment agreement.

### 1. Kreinik's Alleged Breach Of The Competition Restriction

Fairstead contends that Tatum induced Kreinik to breach the competition restriction in his employment agreement by working on Restructured Fairstead. The non-solicitation provision in Kreinik's employment agreement contains language that prohibits him from "work[ing] for, [or] provid[ing] services to . . . a Restricted Entity." The agreement defines a "Restricted Entity" as

> any entity, sole proprietorship, partnership, limited liability company, corporation, joint venture, or individual (collectively, an "Entity") that is in the business of purchasing real estate and one or more persons that worked at a Related Entities in the twelve months prior to your cessation of employment with the Company, are employed by, compensated by, or provide services to the Entity at the time you seek to join the Entity.[305]

Kreinik was bound by this restriction during his employment and for a year after his employment ceased. The restriction did not prohibit Kreinik from working on plans for a potential business.

Restructured Fairstead was not a competing business. It was a proposal for a restructured business. Blodgett pitched it to Feldman.[306] The Separate Company would have been a competing business, but in the spring and summer of 2021, the

---

[305] JX 62 § 3(C).

[306] JX 808 at '004; *see* JX 480 at '002.

86

Separate Company was only an idea. In any event, Blodgett, not Tatum, instructed Kreinik to start working on plans for the Separate Company.[307]

Kreinik joined Tredway, Blodgett's new affordable housing business, in late 2021. Kreinik's employment agreement prohibited him from working at Tredway. But the record does not show that Tatum had any role in Kreinik joining Tredway. Tatum did not join Tredway himself.

Fairstead failed to prove that Tatum engaged in any intentional acts inducing Kreinik to breach the competition restriction in his employment agreement.

### 2.      Kreinik's Alleged Breach Of The Confidentiality Restriction

Kreinik's employment agreement also prohibited him from "us[ing] or attempt[ing] to use any [confidential] information in any manner," except on work for Fairstead.[308] Fairstead contends that Krenik breached this provision by downloading Fairstead's confidential information and using it in modeling for Restructured Fairstead. Fairstead contends that Tatum directed Kreinik's work on the Restructured Fairstead model.

Kreinik downloaded Fairstead files to a USB drive,[309] but Tatum never coordinated or discussed downloading Fairstead files with Kreinik.[310] That leaves the

---

[307] Arb. Decision at 20; JX 437.

[308] JX 62 § 3(A)(1).

[309] *See* JX 5260.

[310] Kreinik Tr. 1333.

possibility that Tatum directed Kreinik to use Fairstead's confidential information for modeling of Restructured Fairstead or the Separate Company. There is no evidence in the record on that point. Tatum provided information that was used in modeling,[311] but the record does not show that Tatum told Kreinik to use Fairstead files for that purpose.[312]

Tatum did not cause Kreinik to breach either the competition or confidentiality restrictions in his employment agreement. Because Fairstead failed to prove the third element of a tortious interference claim, the claim fails.

## G. The Counterclaim For Breach Of Fiduciary Duty

Shifting from contract to tort, Fairstead sought to prove that Tatum breached the fiduciary duties he owed as an employee of Fairstead and as a member of Fairstead Affordable. A claim for breach of fiduciary duty is an equitable tort.[313] The claim has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) breach of that duty.[314]

---

[311] Kreinik Tr. 1350–51.

[312] *See* Tatum Tr. 410–12; Kreinik Tr. 1350–51.

[313] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see* Restatement (Second) of Torts, *supra*, § 874 cmt. b ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[314] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v.*

### 1. The Good Faith Provision

Fairstead first frames its fiduciary duty claim in terms of the Good Faith Provision in the Operating Agreement. As discussed, that provision does not impose fiduciary duties. It is a contractual obligation that requires good faith. For that reason, this decision analyzed the Good Faith Provision as part of the alleged breaches of the Operating Agreement. But that does not end the fiduciary duty analysis.

### 2. The Fiduciary Duty Provision In The Operating Agreement

Although the Good Faith Provision in the Operating Agreement did not impose fiduciary duties on Tatum, a different provision did. The Delaware Limited Liability Company Act (the "LLC Act"), like Delaware's other alternative entity statutes, permit an entity's governing agreement to "expand[] or restrict[] or eliminate[]" fiduciary duties.[315] Drafters of entity agreements almost invariably use that authority to restrict or eliminate fiduciary duties.[316] Before this case, I do not think I

---

*Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002) (TABLE)).

[315] 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . . .").

[316] *See El Paso Pipeline GP*, 113 A.3d at 193 & n.4; *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *12 (Del. Ch. Oct. 7, 2019).

had ever seen a provision expanding fiduciary duties. But for Tatum alone, the drafters of the Operating Agreement took the road less traveled.

The Operating Agreement provides that Fairstead Affordable is managed by a "Majority in Interest."[317] Only one member—FCM Affordable—owns a "Majority in Interest" (its 64.75% membership interest).[318] FCM Affordable was therefore the sole member with manager rights, making Fairstead Affordable a manager-managed entity.[319]

In a manager-managed entity, the manager owes default fiduciary duties to the LLC and its members; the members do not.[320] Tatum therefore did not owe default

---

[317] JX 5280 § 5.1 ("The property, business and affairs of the Company shall be managed by a Majority in Interest. A Majority in Interest shall have full authority, power and absolute discretion to make all decisions with respect to the Company's business and to perform such other services and activities as set forth in this Agreement."); JX 5280 at 6 ("'Majority in Interest' shall mean the Members holding more than fifty percent (50%) of the aggregate Membership Interests held by all Members.").

[318] JX 5280 at Schedule I (indicating that FCM Affordable holds a 64.75% membership interest in Fairstead Affordable).

[319] This outcome differs from the default rule under the LLC statute that provides for member management by a majority in interest. *See* 6 *Del. C.* § 18-402. The Operating Agreement does not create a member-managed entity in which all members have equal managerial rights with the members acting by a majority in interest. *Cf. id.* The Operating Agreement vests managerial authority in the "Majority in Interest," which can only be FCM Affordable.

[320] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) ("Managers and managing members owe default fiduciary duties; passive members do not."); *Beach to Bay Real Estate Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 10, 2017) ("[O]nly managing members or controllers owe fiduciary duties by default in LLCs.").

fiduciary duties under the LLC Act. But the Operating Agreement provides that Tatum "owe[s] fiduciary duties to [Fairstead Affordable] and the other Members."[321] Otherwise, the Operating Agreement eliminates fiduciary duties![322]

It is frankly unclear what this structure envisions. How does a non-managing member owe fiduciary duties *qua* member when that member has no ability to take action as a member? What would the resulting duties be? The parties have not paid any meaningful attention to this topic.

The core fiduciary principle is the duty of loyalty.[323] The duty of loyalty generally requires that a fiduciary for an entity act in subjective pursuit of the best interests of the entity and avoid any conflicts of interest that could cause even a person acting in subjective good faith to act disloyally.[324] By imposing fiduciary duties on a minority member, the Operating Agreement seems to have intended to require

---

[321] JX 5280 § 6.10(a).

[322] *Id.*

[323] *See generally Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 94 (Del. Ch. 2023) ("The duty of loyalty is the core fiduciary principle."); *Hawkins v. Daniel*, 2021 WL 3732539, at *11 (Del. Ch. Aug. 24, 2021) ("The fiduciary principle generally requires that a fiduciary act loyally and in good faith."); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *20 (Del. Ch. Apr. 14, 2017) ("What the fiduciary principle requires in every scenario is that directors strive to maximize value for the benefit of the residual claimants.").

[324] *See generally Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 863, 875, 877 (Del. Ch.) (evaluating whether LLC manager engaged in "bad faith" conduct and acted for "selfish reason[s]" in breach of fiduciary duty of loyalty analysis), *aff'd*, 59 A.3d 1206 (Del. 2012).

the minority member to be loyal when acting as a minority member (the "Minority Member Duty Provision"). Fairstead failed to prove that Tatum breached the fiduciary duty of loyalty that the Minority Member Duty Provision imposed.

### a. Restructured Fairstead And The Separate Company

Fairstead first argues that Tatum breached his fiduciary duties by secretly working with Blodgett to gain control of Fairstead or start a competing business using Fairstead's resources. Fairstead failed to prove that claim.

Tatum's efforts regarding Restructured Fairstead ("Plan A") and the Separate Company ("Plan B") were acts he took as an employee. He did not take those actions as a holder of a minority equity interest in Fairstead Affordable. Fairstead cannot use the Minority Member Duty Provision to claim a breach of the duty of loyalty based on this conduct.

Assuming for the sake of argument that the Minority Member Duty Provision could extend to this conduct, Delaware courts recognize a "privilege" for departing employees to "prepare or make arrangements to compete with their employers prior to leaving . . . without fear of incurring liability for breach of their fiduciary duty of loyalty."[325] Exceptions to this privilege include situations "where the employee has committed some fraudulent, unfair or wrongful act."[326] Examples of misconduct that

---

[325] *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962–63, 965 (Del. 1980) (citations omitted).

[326] *Id*. at 965 (citations omitted).

defeats the privilege include misappropriating trade secrets, misusing confidential information, soliciting customers before ceasing employment, conspiring to bring about mass resignation of key employees, or usurping an employer's business opportunity.[327]

The Court of Chancery has found that it does not constitute a breach of duty for employees to threaten to resign if their demands are not met, even if they warn that their resignations could ruin the business.[328] In *Lazard*, a fund sued former employees and accused them of organizing a "lift-out scheme."[329] The court rejected the idea that employees breached their fiduciary duties by leveraging their key man status, reasoning that "[a]ny damages suffered . . . flowed not from unlawful conduct of [the employees] but from the failure of Lazard . . . to plan for the contingency that their key human capital might exercise its right to depart."[330]

Tatum's conduct did not reach the level of a "fraudulent, unfair or wrongful act."[331] Instead, Goldberg encouraged Blodgett and Tatum to develop a restructuring plan that might be acceptable to Feldman. Tatum was not disloyal to Fairstead

---

[327] *Id.* (citations omitted).

[328] *See Lazard Debt Recovery GP v. Weinstock*, 864 A.2d 955, 958–59 (Del. Ch. 2004).

[329] *Id.* at 964.

[330] *Id.* at 958–59.

[331] *Cf. Sci. Accessories*, 425 A.2d at 965.

Affordable or any of its members when he worked on ideas for a Restructured Fairstead under "Plan A."

Tatum also did not breach his fiduciary duties under Delaware law by working on the backup plan known as "Plan B." Tatum did not do anything that harmed Fairstead Affordable. He did not misuse Fairstead's confidential information or conspire to bring about a mass resignation of Fairstead's key employees. And Tatum never joined Blodgett's new venture. Tatum was entitled to tell Feldman and Goldberg that he planned to leave because he was unhappy. He was also entitled to prepare to compete without fear of incurring liability for a breach of his duty of loyalty, as long as his efforts did not impair his work. The record shows that Tatum performed exemplary work throughout his tenure at Fairstead Affordable.

### b.     The Alleged Solicitation Of Fairstead Employees

Fairstead next argues that Tatum breached the duty of loyalty imposed by the Minority Member Duty Provision by soliciting other Fairstead employees to leave and join a new venture with Blodgett. Fairstead again failed to prove a breach.

As with the prior discussion, Tatum's interactions with other employees were acts he took as an employee. He did not take those actions as a holder of a minority equity interest, so Fairstead cannot use the Minority Member Duty Provision to claim a breach of the duty of loyalty based on this conduct.

Assuming for the sake of argument that the Minority Member Duty Provision could encompass this conduct, Tatum did not breach his duty of loyalty. Under Delaware law, mere solicitation of a colleague is not a fiduciary breach; rather, an

94

employee must engage in a "conspiracy to bring about mass resignation of an employer's key employees."[332] For the reasons discussed in the context of the Good Faith Provision, Tatum did not do that. Only two employees—Kreinik and Sussi—were at issue, which was not a mass resignation. Both were unhappy and would have left anyway. Feldman and Goldberg caused them to leave by failing to give them equity.

### c. The Alleged Misappropriation Of Confidential Information

Fairstead last contends that Tatum breached the duty of loyalty imposed by the Minority Member Duty Provision by misappropriating confidential information. Fairstead failed to prove a breach.

For starters, the same reasoning about the inapplicability of the Minority Member Duty Provision applies. Tatum downloaded information as an employee, not as a minority member.

Assuming the duty did apply, then Fairstead would be on stronger footing. "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision."[333] Delaware courts have also found that downloading documents for one's "own purpose"

---

[332] *Beard Rsch.*, 8 A.3d at 602.

[333] *U.S. W., Inc. v. Time Warner, Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996).

can be a fiduciary breach.[334] But in every case, the employee used the information to compete and failed to return the documents.

Tatum's initial downloading was improper, but he did not go any further. He did not disclose any confidential information to third parties or use any of it to compete with Fairstead. Tatum admitted that the downloading was a mistake, and that's exactly what it was: a mistake. He promptly remedied his mistake. His conduct does not rise to the level of a breach of the duty of loyalty.

### 3. Fairstead's Claim For Breach Of Fiduciary Duties Under New York Law

Fairstead next points to Tatum's fiduciary duties as an employee and agent of Fairstead, which are governed by New York law. Fairstead argues that the same underlying conduct constituted a breach of those duties.

As an employee and agent under New York law, Tatum owed duties of good faith and loyalty to his employer.[335] New York law prohibits an employee "from acting in any manner inconsistent with his agency or trust," and the employee "is at all times bound to exercise the utmost good faith and loyalty in the performance of his

---

[334] *See Metro Storage*, 275 A.3d at 854–57; *Seibold v. Camulos P'rs*, 2012 WL 4076182, at *21 (Del. Ch. Sept. 17, 2012).

[335] *CBS Corp. v. Dumsday*, 702 N.Y.S.2d 248, 251 (App. Div. 2000); *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013), *on reconsideration*, 2014 WL 13109132 (S.D.N.Y. Apr. 14, 2014).

duties."[336] Tatum had "an affirmative duty at all times to act in his employer's best interests."[337] Fairstead did not prove a breach.

Fairstead again relies on the same conduct, but this time cites what it portrays as a winning precedent in *Duane Jones*.[338] In that decision from 1954, the New York Court of Appeals found that a group of employees breached their fiduciary duties by threatening to resign *en masse* if their employer did not agree to sell them a controlling interest in the company.[339] That aspect of *Duane Jones* seems like strong authority for Fairstead, but there was more to the decision. The employees also "presold" the company's customers to their competing business, poached 90% of the company's skilled employees and the majority of its working force, and acquired upwards of 50% of the company's business overnight.[340] *Duane Jones* was a perfect storm for employees facing a breach of duty claim.

Over the ensuing seven decades, New York courts have recognized the extreme facts that resulted in the *Duane Jones* ruling. As one decision noted, "The dominating purpose in the *Duane Jones* case was to damage and paralyze the plaintiff corporation

---

[336] *CBS*, 702 N.Y.S.2d at 251 (internal quotation marks omitted).

[337] *Mar. Fish Prods., Inc. v. World-Wide Fish Prods., Inc.*, 474 N.Y.S.2d 281, 286 (App. Div. 1984).

[338] *See Duane Jones Co. v. Burke*, 117 N.E.2d 237 (N.Y. 1954).

[339] *Id.* at 241, 243, 245.

[340] *Id.*

to enable the defendants to seize it or force a sale to them on their own terms."[341] New York decisions have emphasized that the employees in *Duane Jones* did not merely say they would leave if their employer did not agree to their demands. They engaged in prohibited tactics that included soliciting the company's clients when they were still employed and "attempt[ing] to panic and break the morale of the employees."[342] *Duane Jones* does not stand for the proposition that threatening to leave is a breach of duty. It stands for the proposition that "*en masse* resignations may support a claim for breach of fiduciary duty where those resignations are part of a coordinated effort to 'benefit [the defendants] through destruction of plaintiff's business.'"[343]

Like Delaware courts, New York decisions recognize that "[t]aking preparatory steps, while still in the employer's employ, to enter into a competing business is not a breach of an employee's duty of loyalty as long as the employee does not use the employer's time or resources to do so."[344] Creating a "commercial strategy" for a future company does not breach the duty of loyalty.[345] Talking to a fellow employee about leaving is not a breach of duty, although New York decisions have found that

---

[341] *Town & Country House & Home Serv., Inc. v. Newbery*, 147 N.E.2d 724, 725 (N.Y. 1958).

[342] *Id.*; *see Poller*, 974 F. Supp. 2d at 227.

[343] *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 466–67 & n.12 (S.D.N.Y. 2017).

[344] *Jeremias v. Toms Cap. LLC*, 167 N.Y.S.3d 459, 462 (App. Div. 2022).

[345] *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 206 (E.D.N.Y. 2024).

employees breached their fiduciary duties when the employees used the company's staff and equipment to "set up their new firm" and "solicit[ed] its clients and employees to follow them to their new firm."[346] And under New York fiduciary law, an employee cannot "use his principal's . . . proprietary secrets to build the competing business."[347]

With this deeper understanding of *Duane Jones* and New York law, the operative legal principles do not differ materially from Delaware law. For the same reasons this decision has already discussed, Tatum did not breach his fiduciary duties.

## H. The Counterclaim For Secondary Liability For Breaches of Fiduciary Duty

Fairstead next contends that Tatum should be held secondarily liable for Blodgett's breaches of fiduciary duty. Fairstead invokes two theories of secondary liability: (1) aiding and abetting and (2) conspiracy.

To prevail on their aiding and abetting claim, Fairstead must prove: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a

---

[346] *Weiser LLP v. Coopersmith*, 859 N.Y.S.2d 634, 636 (App. Div. 2008); *see Duane Jones*, 117 N.E.2d at 241, 243, 245.

[347] *Bus. Networks of N.Y. Inc. v. Complete Network Sols. Inc.*, 1999 WL 126088, at *3 (N.Y. Sup. Ct. Feb. 19, 1999), *aff'd in part as modified*, 696 N.Y.S.2d 433 (App. Div. 1999).

result of the breach."[348] New York courts also require that the aider or abettor have substantially assisted the party in breach. "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator."[349] Substantial assistance occurs "when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."[350]

In the arbitration, Fairstead sought to prove that Blodgett breached his fiduciary duties by improperly soliciting Fairstead employees, misappropriating confidential information, attempting to usurp Fairstead's business opportunities, and attempting to wrest control of Fairstead. The arbitrator found that Blodgett breached his fiduciary duties by trying to solicit Fairstead employees and misusing Fairstead's proprietary information.[351] But the arbitrator found that Fairstead failed to prove Blodgett attempted to usurp Fairstead's business opportunities and to wrest control of Fairstead, "particularly in light of the tactics employed by Feldman in connection with Blodgett's termination."[352] The arbitrator also found that Blodgett did not

---

[348] *Louis Cap. Mkts., L.P. v. REFCO Gp. Ltd., LLC*, 801 N.Y.S.2d 490, 493 (Sup. Ct. 2005).

[349] *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (App. Div. 2003).

[350] *Id.*

[351] Arb. Decision at 30.

[352] *Id.*

misappropriate trade secrets, aid or abet Tatum or Kreinik in allegedly breaching their fiduciary duties, or tortiously interfere with Tatum and Kreinik's employment agreements. Blodgett's breaches of fiduciary duty arise from his solicitation of Fairstead employees and his misappropriation of confidential information.

While Tatum could be vicariously liable for Blodgett's tortious actions, Blodgett's conduct is not dispositive in proving Fairstead's claims against Tatum.[353] Blodgett and Tatum may have been "attached at the hip,"[354] and they did form a common law partnership for purposes of negotiating for a controlling equity interest in Fairstead's affordable housing business or starting their own business, but their conduct diverged at critical points.

The record does not show that Tatum knowingly induced or participated in either breach. Tatum did not coordinate with Blodgett to download Fairstead's confidential information. Tatum was not aware that Blodgett was sharing confidential information with the Sussman Office or the Tisch Office. The record also does not show that Tatum substantially assisted Blodgett in soliciting Kreinik and Sussi for a rival business. And Tatum did not join Tredway.

---

[353] *See* 68 C.J.S. Partnership § 209 ("The liability of the other partners is no greater or less than the liability of the one causing the injury. The partnership is liable if the acting partner is found liable for acts taken on behalf of the partnership but neither the partnership nor its members may be held liable for the wrongful act of a partner for which that partner himself or herself is not liable." (internal citations omitted)).

[354] Blodgett Tr. 688, 776.

Because Fairstead failed to prove the second element of an aiding and abetting claim, the analysis need not proceed further.

The conspiracy claim fares no better. "In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting."[355] Consequently, "the confederation requirement includes 'knowing participation' in the conspiracy."[356] The conspiracy analysis falls short for the same reasons as the aiding and abetting claim.

## I. Fee Shifting

Both sides seek expenses (including attorneys' fees). Sometimes parties will "argue their merits arguments in their trial briefs and then conclude their brief by presenting an argument why, if they win on the merits, they are entitled to attorneys' fees."[357] But that is not the required procedure. It can be easier for the court to evaluate the merits of any fee-shifting arguments after finding facts determining liability. The parties should think hard about whether they have grounds to shift attorneys' fees. If they think they do, they should confer and propose a briefing schedule. The parties may not use any motions for attorneys' fees to reargue the court's factual findings or legal rulings.

---

[355] *OptimisCorp v. Waite*, 2015 WL 5147038, at *57 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016).

[356] *Id.*

[357] *Biolase, Inc. v. Oracle P'rs, L.P.*, 97 A.3d 1029, 1036 (Del. 2014).

### III. CONCLUSION

Judgment will be entered against the defendants and in favor of Tatum for the amounts identified in this opinion. Judgment will be entered against Tatum and in favor of the defendants for the expenses they incurred investigating Tatum's taking of confidential information.

Tatum and the defendants are entitled to pre- and post-judgment interest in connection with their successful claims. Interest will accrue at the legal rate, compounded quarterly, with the interest rate changing with changes in the reference rate.

Within thirty days, the parties must submit a form of order to implement this decision. The parties should attempt to agree on the date when pre-judgment interest will begin to run. If disputes over that issue or other matters need to be addressed before a final judgment can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. That instruction enlists the parties' assistance in ensuring that no issues have been overlooked. It is not an invitation to raise new issues or seek a do-over.